# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN FIELDS**, *et al.*, | : | **CIVIL ACTION NO. 1:16-CV-1764** |
| | : | |
| **Plaintiffs** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **SPEAKER OF THE** | : | |
| **PENNSYLVANIA HOUSE OF** | : | |
| **REPRESENTATIVES**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

The Pennsylvania House of Representatives commences legislative
sessions with an opening invocation delivered by either a member of the House
or a guest chaplain.  Pursuant to an internal House rule, a guest chaplain must
be "a member of a regularly established church or religious organization."[1]
The Speaker of the House interprets this rule to exclude "non-adherents" and
"nonbelievers" from the guest chaplain program.[2]  Plaintiffs are atheist, agnostic,
Secular Humanist, and freethinking individuals who have been denied the
opportunity to deliver an opening invocation due to the nontheistic nature of
their beliefs.  Plaintiffs challenge the exclusionary House policy under the First
and Fourteenth Amendments to the United States Constitution.

---

[1] GEN. OPERATING RULES OF THE PA. HOUSE OF REP. R. 17.
[2] Doc. 1 ¶ 191.

## I. **Background**

Brian Fields, Paul Tucker, Deana Weaver, Scott Rhoades, and Joshua Neiderhiser are nontheists who actively adhere to and practice their respective beliefs.[3] As employed herein, our nontheist designation includes atheists, agnostics, Secular Humanists, freethinkers, and other persons who do not believe in a deity.[4] Many features of plaintiffs' respective ideologies parallel the practice of traditional theistic religions: plaintiffs assemble to explore and discuss their beliefs, study texts and films anent their belief systems, observe annual celebrations, and coordinate service activities and community outreach.[5]

Plaintiffs are leaders in their belief communities. Fields is president of Pennsylvania Nonbelievers, Tucker is founder and chief organizer of Dillsburg Area Freethinkers, and Rhoades is founder and president of Lancaster Freethought Society.[6] These nontheist organizations and their leaders represent the functional equivalent of traditional religious congregations in the lives of their members.[7] For example, Rhoades and Neiderhiser are ordained Humanist Celebrants who regularly perform wedding ceremonies and memorial services.[8]

---

[3] Doc. 1 ¶¶ 10, 30, 41, 50, 66.
[4] Humanism is "a progressive philosophy of life that, without theism or other supernatural beliefs, affirms [the] ability and responsibility to lead ethical lives of personal fulfillment that aspire to the greater good of humanity." *What is Humanism*, AM. HUMANIST ASS'N, http://americanhumanist.org/Humanism. A "freethinker" is a person who forms "opinions about religion based on reason, independently of established belief, tradition, or authority." Doc. 1 ¶ 41.
[5] Id. ¶¶ 13-19, 31-34, 42-43, 52-58, 67-70; see also id. ¶¶ 79-86, 93-95, 101-104.
[6] Id. ¶¶ 13, 31-32, 55.
[7] Id. ¶¶ 86, 95, 104.
[8] Id. ¶¶ 52-53, 67.

Each of the individual plaintiffs would like to deliver an invocation before the House.[9]  Plaintiffs intend to offer uplifting and inspirational messages—to champion such unobjectionable themes as equality, unity, and common decency; and to demonstrate that nontheists can offer meaningful commentary on morality and reflections valuable to public governance.[10]

## A.    The Opening Invocation

The House convenes daily legislative sessions which are open to the public and streamed live on the House website.[11]  Members of the public attending the sessions observe proceedings from the visitor gallery located in a balcony at the rear of the House chamber.[12]  Fields and Rhoades have attended daily sessions in the past and intend to do so in the future.[13]

Before the opening invocation, the Speaker directs members of the House and visitors in the gallery to rise.[14]  Members of the House and most visitors oblige,[15] but Fields and Rhoades apparently prefer to remain seated.[16]  On one occasion, the Speaker publicly singled out Fields and Rhoades and ordered them to rise for the invocation.[17]  When they refused, the Speaker directed a legislative security officer to "pressure" them to stand.[18]  Plaintiffs believe that the Speaker's direction to rise

---

[9] Id. ¶¶ 25, 37, 46, 61, 73.
[10] See id.
[11] Id. ¶ 143.
[12] Id. ¶ 147.
[13] Id. ¶¶ 22-23, 60.
[14] Id. ¶ 154.
[15] Id. ¶¶ 158-59.
[16] Id. ¶¶ 23-24, 60.
[17] Id. ¶¶ 24, 60.
[18] Id.

coerces them (and others) to recognize the validity of religious beliefs with which they disagree.[19]

### B. The Guest Chaplain Policy

House members may nominate guest chaplains by submitting a request to the Speaker's office.[20] The request must identify the proposed chaplain's name, house of worship or affiliated organization, and contact information.[21] The Speaker reviews and selects guest chaplains from among the submitted nominees.[22] The Speaker then sends a form letter to selected chaplains which asks them to "craft a prayer that is respectful of all religious beliefs."[23] The Speaker does not review the content of an opening invocation before it is delivered.[24] Guest chaplains receive a commemorative gavel and a photograph with the House member who nominated them.[25]

Between January 8, 2008 and February 9, 2016, the House convened 678 daily sessions and began 575 of them with an invocation.[26] Members of the House delivered 310 of those invocations, and guest chaplains delivered the remaining 265 invocations.[27] Of the guest chaplains, 238 were Christian clergy, twenty-three were Jewish rabbis, and three were of the Muslim faith.[28] Only one guest chaplain was

---

[19] Id. ¶¶ 27, 63.
[20] Id. ¶¶ 162-63.
[21] See id.
[22] Id. ¶¶ 165-66.
[23] Id. ¶¶ 167-69.
[24] Id. ¶ 170.
[25] Id. ¶¶ 171-72.
[26] Id. ¶¶ 173-75.
[27] Id. ¶¶ 177, 179.
[28] Id. ¶¶ 180-82.

not "recognizably affiliated" with a particular religion, but that person nonetheless delivered a monotheistic message.[29]  According to the complaint, no invocation was free of theistic content, and none had content associated with faiths other than Christianity, Judaism, or Islam.[30]

On August 12, 2014, Weaver emailed a request to her House representative on behalf of Dillsburg Area Freethinkers seeking to deliver an invocation.[31]  Two weeks later, Carl Silverman, a member of Pennsylvania Nonbelievers, wrote his House representative, requesting that either he or Fields be permitted to deliver an invocation on behalf of their organization.[32]  The Speaker denied Silverman's request by letter dated September 25, 2014, stating that the House is not "required to allow non-adherents or nonbelievers the opportunity to serve as chaplains."[33]  Weaver's representative forwarded the Silverman response to her via email on September 26, 2014.[34]  Thereafter, the House amended its General Operating Rules to include House Rule 17.[35]  Per the new rule: "The Chaplain offering the prayer shall be a member of a regularly established church or religious organization or shall be a member of the House of Representatives."[36]

On January 9, 2015, plaintiffs' counsel wrote to the Speaker and House Parliamentarian requesting that a representative of Pennsylvania Nonbelievers be

---

[29] Id. ¶ 183.
[30] Id. ¶¶ 184-86.
[31] Id. ¶ 189; Doc. 1-4.
[32] Doc. 1 ¶ 190; Doc. 1-5.
[33] Doc. 1 ¶ 191; Doc. 1-6 at 2.
[34] Doc. 1 ¶ 192; Doc. 1-7.
[35] See Doc. 1 ¶ 194.
[36] Id. ¶ 161; GEN. OPERATING RULES OF THE PA. HOUSE OF REP. R. 17.

permitted to serve as guest chaplain.[37]  In a response dated January 15, 2015, the

Parliamentarian denied Pennsylvania Nonbelievers' request, citing House Rule 17.[38]

On August 6, 2015, plaintiffs' counsel sent a final letter to all defendants requesting

that Fields, Tucker, Weaver, Rhoades, or Neiderhiser, or a representative of their

organizations, be given an opportunity to deliver an invocation.[39]  By separate letter

of the same date, counsel asked the Speaker and Parliamentarian to cease directing

House visitors to stand for invocations.[40]  The Parliamentarian denied plaintiffs'

guest chaplaincy request by letter dated September 9, 2015.[41]  Plaintiffs received no

response to their letter concerning the directive to rise for opening invocations.[42]

### C.    Procedural History

Plaintiffs commenced this action by filing a complaint on August 25, 2016.[43]

Plaintiffs name as defendants the Speaker of the House, the Parliamentarian of the

House, and the Representatives of Pennsylvania House Districts 92, 95, 97, 193, and

196.[44]  Defendants are named in their official capacities alone.  Plaintiffs claim that

the House policy of preferring theistic over nontheistic religions contravenes the

First and Fourteenth Amendments.  Plaintiffs request declaratory judgment as to

---

[37] Id. ¶ 193; Doc. 1-8.

[38] Doc. 1 ¶ 194; Doc. 1-9.

[39] Doc. 1 ¶ 195; Docs. 1-10 to 1-13.

[40] Doc. 1 ¶ 195; Doc. 1-14.

[41] Doc. 1 ¶ 196; Doc. 1-15.

[42] Doc. 1 ¶ 197.

[43] Doc. 1.

[44] Id. ¶¶ 109, 118, 123, 127, 131, 135, 139.  As of this writing, the Speaker of the House is the Honorable Mike Turzai, the Parliamentarian is Clancy Myer, and the Honorable Dawn Keefer, Carol Hill-Evans, Steven Mentzer, Will Tallman, and Seth Grove serve as representatives of House Districts 92, 95, 97, 193, and 196, respectively.  See MEMBERS OF THE HOUSE OF REPRESENTATIVES, http://www.legis.state.pa.us/cfdocs/legis/home/member _information/pdf/addr_hse.pdf (updated Apr. 28, 2017).

the constitutionality of House Rule 17 (as interpreted by the Speaker) and the House practices of favoring theists to nontheists and directing visitors to rise for opening invocations.[45]  Plaintiffs seek injunctive relief requiring the House to permit plaintiffs to deliver nontheistic invocations, prohibiting defendants from discriminating against nontheistic speakers, and enjoining the Speaker from directing visitors to rise for invocations.[46]

Defendants moved to dismiss plaintiffs' complaint *in extenso*,[47] and the parties thoroughly briefed defendants' motion.[48]  The court convened oral argument on February 22, 2017,[49] and the motion is ripe for disposition.

## II.    Legal Standards

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a claim for lack of subject matter jurisdiction.[50]  Such jurisdictional challenges take of one two forms: (1) parties may levy a "factual" attack, arguing that one or more of the pleading's factual allegations are untrue, removing the action from the court's jurisdictional ken; or (2) they may assert a "facial" challenge, which assumes the veracity of the complaint's allegations but nonetheless argues that a claim is not

---

[45] Doc. 1 ¶ 280.
[46] Id. ¶¶ 276-78.
[47] Doc. 31.
[48] Docs. 33, 36, 39.
[49] See Docs. 41, 43.
[50] See FED. R. CIV. P. 12(b)(1).

within the court's jurisdiction.[51]  In either instance, it is the plaintiff's burden to establish jurisdiction.[52]

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.[53] When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."[54]  In addition to reviewing the facts contained in the complaint, the court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case."[55]

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[56] To test the sufficiency of the complaint, the court conducts a three-step inquiry.[57]  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"[58]  Next, the factual and legal elements of a claim must be separated;

---

[51] See Lincoln Benefit Life Co. v. AEI Life, LLC, 800 F.3d 99, 105 (3d Cir. 2015) (quoting CNA v. United States, 535 F.3d 132, 139 (3d Cir. 2008)); Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).

[52] See Mortensen, 549 F.2d at 891.

[53] FED. R. CIV. P. 12(b)(6).

[54] Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

[55] Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); see Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

[56] Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

[57] See Santiago v. Warminster Twp., 629 F.3d 121, 130-31 (3d Cir. 2010).

[58] Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).

well-pleaded facts must be accepted as true, while mere legal conclusions may be disregarded.[59]  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."[60]  A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[61]

Courts should grant leave to amend before dismissing a curable pleading in civil rights actions.[62]  Courts need not grant leave to amend *sua sponte* in dismissing non-civil rights claims pursuant to Rule 12(b)(6),[63] but leave is broadly encouraged "when justice so requires."[64]

## III.  <u>Discussion</u>

Plaintiffs adjure that defendants' prescript for theistic religions offends a quartet of constitutional provisions: *first*, the Establishment Clause, by favoring theism to nontheism and excessively entangling the House in religious judgment, and coercing House visitors to participate in theistic prayer; *second*, the Free Exercise Clause, by requiring nontheists to adopt or profess theistic beliefs and proscribing nontheistic beliefs; *third*, the Free Speech Clause, by denying nontheists the opportunity to participate in government activities based on the

---

[59] <u>Id.</u> at 131-32; <u>see</u> <u>also</u> <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210-11 (3d Cir. 2009).
[60] <u>Iqbal</u>, 556 U.S. at 679 (citing <u>Twombly</u>, 550 U.S. at 556); <u>Twombly</u>, 550 U.S. at 556.
[61] <u>Iqbal</u>, 556 U.S. at 678.
[62] <u>See</u> <u>Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.</u>, 482 F.3d 247, 251 (3d Cir. 2007); <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108 (3d Cir. 2002).
[63] <u>Fletcher-Harlee Corp.</u>, 482 F.3d at 252-53.
[64] Fed. R. Civ. P. 15(a)(2).

perceived nonconformity of their beliefs, and censoring invocations to prohibit reflection of those beliefs; and *fourth*, the Equal Protection Clause, by permitting theists but not nontheists to serve as guest chaplains.

Defendants' motion tests the justiciability and the merits of all four claims. Defendants oppugn plaintiffs' standing under the Establishment Clause for failure to plead cognizable harm. Defendants contest plaintiffs' standing under the Free Speech, Free Exercise, and Equal Protection Clauses for want of a legally protected interest. Assuming standing *arguendo*, defendants attack the merits of plaintiffs' Establishment Clause claim, asserting that the House invocation policies embodied in Rule 17 find support in Supreme Court precedent. Defendants also remonstrate that the Free Speech, Free Exercise, and Equal Protection Clauses do not apply to government speech. We address each argument *seriatim*.

## A.    Justiciability

Article III of the United States Constitution limits the scope of the federal judicial power to those cases involving actual "cases" and "controversies."[65] The doctrine of "standing" safeguards this essential limitation by requiring a party to have a "requisite stake in the outcome" of the lawsuit before invoking the court's jurisdiction.[66] At an "irreducible . . . minimum," Article III requires plaintiffs to establish three elements: injury in fact, causation, and redressability.[67]

---

[65] U.S. CONST. art. III, § 2.
[66] Constitution Party of Pa. v. Aichele, 757 F.3d 347, 356-57, 360 (3d Cir. 2014) (quoting Davis v. FEC, 554 U.S. 724, 734 (2008)).
[67] Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992).

## 1.   *Standing of the Individual Plaintiffs*

The Third Circuit has held that standing in the Establishment Clause context "requires only direct and unwelcome personal contact with the alleged establishment of religion."[68]  This is not to say that every fleeting contact with state-established religious preference is justiciable.  A plaintiff must plead "a concrete grievance that is particularized to him."[69]  Generalized, attenuated disagreements will not suffice.[70]

The Supreme Court, recognizing the abstract nature of religious injury, has articulated three distinct theories of Establishment Clause standing: (1) direct harm standing; (2) denied benefit standing; and (3) taxpayer standing.[71]  Plaintiffs do not invoke taxpayer standing.[72]  Nor do plaintiffs suggest they have been denied a

---

[68] Freedom From Religion Found. v. New Kensington Arnold Sch. Dist., 832 F.3d 469, 476-77 (3d Cir. 2016) (citing Red River Freethinkers v. City of Fargo, 679 F.3d 1015, 1023 (8th Cir. 2012); Cooper v. USPS, 577 F.3d 479, 491 (2d Cir. 2009); Vasquez v. L.A. Cty., 487 F.3d 1246, 1253 (9th Cir. 2007); ACLU of Ohio Found. v. Ashbrook, 375 F.3d 484, 489-90 (6th Cir. 2004); Suhre v. Haywood Cty., 131 F.3d 1083, 1086 (4th Cir. 1997); Foremaster v. City of St. George, 882 F.2d 1485, 1490-91 (10th Cir. 1989); Saladin v. City of Milledgeville, 812 F.2d 687, 692 (11th Cir. 1987)).

[69] Id. at 478 (citing Valley Forge Christian Coll. v. Am. United for Separation of Church and State, 454 U.S. 464, 482-83 (1992)).

[70] Id.

[71] See Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 129-30 (2011).

[72] The Supreme Court's first legislative prayer case relied in part on taxpayer standing, affirming the Eighth Circuit's conclusion that the plaintiff, "as a member of the Legislature *and* as a taxpayer whose taxes are used to fund the chaplaincy," had standing to sue.  Marsh v. Chambers, 463 U.S. 783, 786 n.4 (1983) (emphasis added).  Only one other court has found taxpayer standing: in Pelphrey v. Cobb Cty., 547 F.3d 1263 (11th Cir. 2008), the Eleventh Circuit concluded that municipal taxpayers had standing to pursue a First Amendment challenge when the county "expend[ed] municipal funds, in the form of materials and personnel time, to select, invite, and thank the invocational speakers."  Id. at 1267, 1280-81.  Plaintiffs herein offer no argument or allegation inviting a *sua sponte* finding of taxpayer standing.

benefit as a result of defendants' interpretation of House Rule 17.[73]  Hence, we examine plaintiffs' standing under a "direct harm" theory.

Defendants assert broadly that plaintiffs do not allege sufficient "personal contact" with a state-established religious preference.[74]  At the outset, defendants posit that only Fields and Rhoades have been exposed to theistic legislative prayer because only Fields and Rhoades have attended House daily sessions.[75]  This argument misapprehends plaintiffs' harm: plaintiffs do not claim injury from experiencing theistic prayer, but from the House's refusal to include nontheistic messages in its guest chaplain program.[76]  All plaintiffs have adequately pled exposure to the alleged establishment of religion.

Defendants contend that plaintiffs' exposure is not sufficiently direct or immediate to confer standing.[77]  We flatly reject this contention.  Plaintiffs' harm is hardly "attenuated."  To the contrary, each plaintiff applied for and was denied the opportunity to present an invocation—an opportunity provided to adherents of conventional, monotheistic religions.[78]  According to the complaint, the House denied plaintiffs' requests as a direct and exclusive result of antipathy toward nontheism.[79]  Notably, the only other federal court to address this question held unequivocally that "exclusion from the list of those eligible to give an invocation" is

---

[73] See Ariz. Christian Sch. Tuition Org., 563 U.S. at 130 (explaining that denied benefit standing exists when plaintiffs "have incurred a cost or been denied a benefit on account of their religion").
[74] See Doc. 33 at 24-29.
[75] See id.
[76] See Doc. 1 ¶¶ 26, 38, 47, 62, 74; Doc. 50 at 45:24-46:25.
[77] See Doc. 33 at 27-29.
[78] Doc. 1 ¶¶ 189-96; Docs. 1-4 to 1-15; see also Doc. 1 ¶¶ 26, 38, 47, 62, 74.
[79] See Doc. 1 ¶ 191.

injury sufficient to satisfy Article III.[80]  We agree.  Plaintiffs allege cognizable injury in fact for purposes of the Establishment Clause.

With respect to plaintiffs' coercion claims, defendants also dispute redressability.  Defendants concede that Fields' and Rhoades' "glancing exposure to religious expression" at House sessions "might in some instances suffice to confer standing."[81]  They rejoin that even if the court orders the House to invite nontheist chaplains, plaintiffs will continue to experience theistic prayer in the House chamber.[82]  Defendants again misapprehend the nature of the alleged constitutional injury and requested relief—plaintiffs do not seek to eliminate all theistic content; they challenge the practice of permitting *only* theistic content.[83]  A more inclusive policy would directly redress plaintiffs' alleged injury.

Defendants also contend that plaintiffs cannot establish injury under the Free Speech, Free Exercise, and Equal Protection Clauses because legislative prayer is circumscribed by the Establishment Clause alone.[84]  Defendants are correct that courts generally hold legislative prayer to be "government speech"[85] which is not subject to review under the Free Speech, Free Exercise, and Equal

---

[80] See Simpson v. Chesterfield Cty. Bd. of Supervisors, 404 F.3d 276, 279 n.2 (4th Cir. 2005).
[81] Doc. 33 at 25.
[82] Id. at 25-26.
[83] See Doc. 50 at 45:24-46:25.
[84] See Doc. 33 at 20-23.
[85] See Simpson, 404 F.3d at 288; Coleman v. Hamilton Cty., 104 F. Supp. 3d 877, 890-91 (E.D. Tenn. 2015).

Protection Clauses.[86]  The flaw in defendants' position is that it erroneously conflates justiciability with merit.  No case that defendants cite—and none that research has unveiled—dismisses a legislative prayer claim brought pursuant to the Free Speech, Free Exercise, and Equal Protection Clauses on *standing* grounds.[87]  Defendants conceded as much at oral argument.[88]  *Per contra*, several courts have expressly resolved that plaintiffs *do* have standing to sue when excluded from government speech.[89]

Defendants' position is in direct tension with recent Third Circuit precedent holding that "[t]he indignity of being singled out [by the government] . . . on the basis of one's religious calling . . . is enough to get in the courthouse door."[90]  It is undermined further by the fundamental principle that standing inquiries focus on parties and not on issues.[91]  We are satisfied that plaintiffs have standing under the

---

[86] See, e.g., Simpson, 404 F.3d at 288; Coleman, 104 F. Supp. 3d at 890-91; Atheists of Fla., Inc. v. City of Lakeland, 779 F. Supp. 2d 1330, 1341-42 (M.D. Fla. 2011) (quoting Simpson, 404 F.3d at 288); see also Turner v. City Council of City of Fredericksburg, 534 F.3d 352, 356 (4th Cir. 2008) (O'Connor, J., sitting by designation) (quoting Simpson, 404 F.3d at 288).

[87] For example, defendants cite Choose Life Illinois, Inc. v. White, 547 F.3d 853 (7th Cir. 2008), for their assertion that "there can be no injury-in-fact as necessary to confer standing" in government speech cases under the Free Speech or Free Exercise Clauses. Doc. 33 at 21.  But the court in Choose Life Illinois found that plaintiffs *did* have standing to assert a Free Speech claim before ultimately rejecting the claim on the merits.  Choose Life Ill., Inc., 547 F.3d at 858-67, 858 n.3.  Other cases cited by defendants reject Free Speech, Free Exercise, and Equal Protection prayer challenges on the merits rather than for lack of standing.  See Simpson, 404 F.3d at 288; Coleman, 104 F. Supp. 3d at 890-91; Atheists of Fla., Inc., 779 F. Supp. 2d at 1341-42.

[88] See Doc. 50 at 7:23-8:10, 15:21-25.

[89] See Simpson, 404 F.3d at 279 n.2; see also Choose Life Ill., Inc., 547 F.3d at 858 n.3.

[90] Hassan v. City of N.Y., 804 F.3d 277, 299 (3d Cir. 2015) (first and second alterations in original) (quoting Locke v. Davey, 540 U.S. 712, 731 (2004) (Scalia, J., dissenting)).

[91] Flast v. Cohen, 392 U.S. 83, 99 (1968).

Free Speech, Free Exercise, and Equal Protection Clauses, and we will proceed to a merits analysis on these claims.

### 2. *Standing of the Organizational Plaintiffs*

Defendants contest organizational standing in a footnote.[92] An organization may establish standing in two ways: on its own behalf and on behalf of its members. Courts measure an organization's standing to sue in its own right against the same rubric outlined *supra* for individual standing.[93] An organization may also sue in a representative capacity when (1) its members would have standing on their own behalf; (2) the interests sought to be defended by the lawsuit "are germane to the organization's purpose"; and (3) the claims asserted and relief sought do not require individual member participation.[94] The organizational plaintiffs *sub judice* articulate no basis for individual standing—their claims are purely derivative. The court tests the organizations' standing in their representative capacities alone.

Organizational standing is generally not appropriate in actions for monetary damages.[95] In such cases, proof tends to be largely individualized and nuanced as to each member, rendering representative standing impracticable.[96] But "*some*

---

[92] Doc. 33 at 18-19 n.5.

[93] See Pa. Prison Soc'y v. Cortes, 508 F.3d 156, 163 (3d Cir. 2007) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 372-79 (1982); Warth v. Seldin, 422 U.S. 490, 511 (1975)).

[94] Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977); Pa. Prison Soc'y, 622 F.3d at 228.

[95] See Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278, 284 (3d Cir. 2002) (citing United Food & Commercial Workers Union Local 751 v. Brown Gr., Inc., 517 U.S. 544, 546 (1996); Hunt, 432 U.S. at 343).

[96] See id. (citing United Food, 517 U.S. at 546; Hunt, 432 U.S. at 343).

individual participation" does not violate this principle.[97]  The Supreme Court and Third Circuit have squarely held that requests for declaratory and injunctive relief generally "do not require participation by individual association members."[98] Plaintiffs assert uniform and systemic harms, and they seek only declaratory and injunctive relief.  The organizational plaintiffs' claims require no individualized proof beyond testimony as to their members' respective experiences with the House's legislative prayer practice.  We conclude that Pennsylvania Nonbelievers, Dillsburg Area Freethinkers, and Lancaster Freethought Society have properly asserted organizational standing.[99]

## B.    Constitutional Claims

Section 1983 of Title 42 of the United States Code creates a private cause of action to redress constitutional wrongs committed by state officials.[100]  The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law.[101]  To state a claim under Section 1983, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the

---

[97] Id. at 283-84 (emphasis added).

[98] Hosp. Council of W. Pa. v. City of Pittsburgh, 949 F.2d 83, 89 (3d Cir. 1991) (citing Pennel v. City of San Jose, 485 U.S. 1, 7 n.3 (1988); UAW v. Brock, 477 U.S. 274, 287-88 (1986)).

[99] Defendants raise other justiciability concerns in their Rule 12(b)(6) briefing, to wit: legislative immunity and the political question doctrine.  See Doc. 33 at 28 n.9, 38 n.11.  At oral argument, counsel confirmed that defendants are not pursuing these defenses at this juncture.  Doc. 50 at 27:23-28:14.

[100] See 42 U.S.C. § 1983.

[101] Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).

United States . . . by a person acting under color of state law."[102]  There is no dispute

that the House defendants are state actors within the purview of Section 1983.  We

must thus determine whether the House legislative prayer practice deprives

plaintiffs of rights secured by the United States Constitution.  We begin with the

Establishment Clause.

### 1.    *Establishment Clause*

The First Amendment prohibits the government from making any law

"respecting an establishment of religion."[103]  Courts ordinarily apply one of three

tests to evaluate government practices under the Establishment Clause: the

coercion test, the endorsement test, and the Lemon test.[104]  Legislative prayer,

however, occupies *sui generis* status in Supreme Court jurisprudence and our

nation's history.  In its only two cases on the subject, Marsh v. Chambers, 463 U.S.

783 (1983), and Town of Greece v. Galloway, 134 S. Ct. 1811 (2014), the Court upheld

state and municipal prayer practices without resort to traditional Establishment

Clause principles.

In its first legislative prayer case, Marsh v. Chambers, 463 U.S. 783 (1983), the

Court examined a legislature's practice of opening sessions with a prayer delivered

by a chaplain.  The Nebraska state legislature appointed the same Presbyterian

---

[102] Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

[103] U.S. CONST. amend. I.

[104] See Lee v. Weisman, 505 U.S. 577 (1992) (coercion); Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573 (1989) (endorsement); Lemon v. Kurtzman, 403 U.S. 602 (1971).

minister to serve as chaplain for sixteen years.[105]  The chaplain was paid a monthly salary from legislative funds.[106]  A member of the legislature sued, challenging the practice as an unlawful establishment of religion.[107]  The district court upheld the chaplaincy, but enjoined payment of a salary from public coffers.[108]  The Eighth Circuit Court of Appeals affirmed in part and reversed in part, applying the <u>Lemon</u> test to hold that the prayer practice *in toto* violated the Establishment Clause.[109]

The Supreme Court reversed.  Writing for the majority, Justice Burger chronicled the ubiquity of legislative prayer in the annals of our nation.[110]  He noted that the First Congress set about appointing and compensating legislative chaplains the very week it drafted the Bill of Rights, suggesting the Framers did not perceive the practice as violative of the First Amendment.[111]  The Court pronounced that an "unambiguous and unbroken history of more than 200 years" of legislative prayer had woven the ritual into the very "fabric of our society."[112]  The Court concluded that "[t]o invoke Divine guidance" before engaging in the important work of public governance is not establishment of religion but "a tolerable acknowledgement of beliefs widely held" among citizens.[113]

Turning to the particulars of Nebraska's practice, the Court found that no aspect transcended the bounds of permissible legislative prayer.  Absent proof of an

---

[105] See <u>Marsh v. Chambers</u>, 463 U.S. 783, 784-85, 793 (1983).
[106] <u>Id.</u> at 785, 793.
[107] <u>Id.</u> at 785.
[108] <u>Chambers v. Marsh</u>, 504 F. Supp. 585, 588-93 (D. Ne. 1980).
[109] <u>Chambers v. Marsh</u>, 675 F.2d 228, 233-235 (8th Cir. 1982).
[110] See <u>Marsh</u>, 463 U.S. at 786-91.
[111] <u>Id.</u> at 787-88.
[112] <u>Id.</u> at 792.
[113] <u>Id.</u>

"impermissible motive," the 16-year tenure of a minister representing a single faith did not violate the Establishment Clause.[114] Nor was the Court troubled that public monies funded the chaplaincy, citing again the First Congress.[115] As for content, the Court jettisoned concerns with the principally Judeo-Christian nature of the messages, resolving that content is of no moment when, as in Nebraska, "there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief."[116]

The Supreme Court subsequently explored <u>Marsh</u> in <u>County of Allegheny v. ACLU Greater Pittsburgh Chapter</u>, 492 U.S. 573 (1989), a case concerning public-sponsored holiday displays. The deeply-divided Court resolved that government display of a crèche, a uniquely Christian symbol, contravened the Establishment Clause.[117] Tasked by Justice Kennedy's dissent to square its result with <u>Marsh</u>, the majority highlighted the content of the Nebraska chaplain's prayers, contrasting his general religious references with the "specifically Christian symbol" of a crèche.[118] Following <u>County of Allegheny</u>, some courts construed <u>Marsh</u> to authorize only nonsectarian legislative prayer.[119]

Thirty-one years after <u>Marsh</u>, the Court revisited legislative prayer in <u>Town of Greece v. Galloway</u>, 572 U.S. __, 134 S. Ct. 1811 (2014). In 1999, the town of

---

[114] <u>Id.</u> at 793-94.
[115] <u>Id.</u> at 794.
[116] <u>Id.</u> at 794-95.
[117] <u>See</u> Cty. of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 603 (1989).
[118] <u>Id.</u> at 602-05.
[119] <u>See, e.g.</u>, <u>Joyner v. Forsyth Cty.</u>, 653 F.3d 341, 349-50 (4th Cir. 2011); <u>Wynne v. Town of Great Falls</u>, 376 F.3d 292, 298-302 (4th Cir. 2004).

Greece, New York, opened its monthly meetings with invocations delivered by local clergy.[120]  A clerical employee would contact congregations listed in a local directory until she found a willing clergyperson.[121]  Town leaders described their policy as welcoming minsters and laypersons "of any persuasion," including atheists.[122]  In practice, nearly all invocations given from 1999 to 2007 were Christian in nature, reflecting the principal religious disposition of the town's population.[123]

Susan Galloway and Linda Stephens attended the monthly meetings and objected to the invocation practice on religious and philosophical grounds.[124]  The town thereafter invited a Jewish layman, the chairman of a local Baha'i temple, and a Wiccan priestess to serve as chaplains, but soon reverted to Christian themes.[125]  Galloway and Stephens filed suit, asserting that the town committed a twofold violation of the Establishment Clause, by: (1) sponsoring sectarian as opposed to "inclusive and ecumenical" messages and (2) fostering a coercive environment where attendees felt pressured to participate in religious observance with which they disagreed.[126]  The district court rejected both claims.[127]  The Court of Appeals for the Second Circuit reversed, holding that a "steady drumbeat" of exclusively

---

[120] Town of Greece v. Galloway, 572 U.S. __, 134 S. Ct. 1811, 1816 (2014).
[121] Id.
[122] Id.
[123] See id.
[124] Id. at 1817.
[125] Id.
[126] Id. at 1817, 1819-20.
[127] See Galloway v. Town of Greece, 732 F. Supp. 2d 195, 215-243 (W.D.N.Y. 2010).

Christian content effectively affiliated the town with a single religion.[128]  The town of

Greece appealed, and the Supreme Court granted *certiorari*.[129]

In an opinion authored by Justice Kennedy, the Court addressed plaintiffs'

claims in two parts, with the first (Part II-A) garnering majority support.  Justice

Kennedy, joined by the Chief Justice as well as Justices Thomas, Alito, and Scalia,

held that the Constitution tolerates even sectarian legislative prayer.[130]  According

to the majority, the Marsh result attained not because the chaplain's messages were

nonsectarian, but because such prayer practices had for centuries existed in quiet

equipoise with the First Amendment.[131]  The Court framed its inquiry as "whether

the prayer practice . . . fits within the tradition long followed in Congress and the

state legislatures," and held that a requirement of ecumenical or nonsectarian

prayer is inconsistent with that tradition.[132]  In closing, the majority perceptibly

amplified Marsh, observing that a given prayer practice will not likely violate the

Constitution unless the prayers reflect a *pattern* of denigrating or proselytizing

content or an impermissible purpose.[133]  The Court forewarned, however, that

history and tradition cannot save an otherwise unconstitutional practice.[134]

The majority then addressed the Second Circuit's finding that the town

violated the Establishment Clause by inviting guest chaplains of "predominantly

---

[128] Galloway v. Town of Greece, 681 F.3d 20, 32 (2d Cir. 2012).
[129] Town of Greece v. Galloway, 133 S. Ct. 2388 (2013) (mem.).
[130] Town of Greece, 134 S. Ct. at 1820-24.
[131] Id. at 1820 (quoting Marsh, 463 U.S. at 786).
[132] Id. at 1819-21.
[133] Id. at 1824.
[134] Id. at 1819.

Christian" faiths.[135]  The Court held that, "[s]o long as the town maintains a policy of nondiscrimination," the First Amendment does not require it to achieve religious stasis.[136]  The Court found no evidence of an "aversion or bias" toward minority faiths by the town of Greece; contrarily, the town undertook reasonable efforts to identify all prospective guest chaplains, and its policy welcomed ministers and laity of all creeds.[137]  In his concurring opinion, Justice Alito suggested that the outcome should differ when omission of a particular religion is "intentional" rather than "at worst careless."[138]

Part II-B of the opinion was joined only by the Chief Justice and Justice Alito. Justice Kennedy began with the "elemental" principle that "government may not coerce its citizens 'to support or participate in any religion or its exercise.'"[139]  The three-Justice plurality opined that claims of coercion must be measured in view of both setting and audience.[140]  As for setting, a "brief, solemn and respectful prayer" at the start of a meeting is consistent with "heritage and tradition" familiar to the public.[141]  Attendees are presumed to understand that the purpose of the exercise is not to proselytize but to "lend gravity" to the proceedings.[142]  Concerning audience, the plurality found that the chaplain's messages were intended to "accommodate

---

[135] Id. at 1824.
[136] Id.
[137] Id.
[138] Id. at 1830-31 (Alito, J., concurring).
[139] Id. at 1825 (plurality opinion) (quoting Cty. of Allegheny, 492 U.S. at 659).
[140] Id.
[141] Id.
[142] Id.

the spiritual needs of lawmakers" rather than preach to the visiting public.[143]  These considerations together weighed against a finding of coercion.[144]

In a concurring opinion, Justice Thomas took exception to the plurality's coercion analysis.[145]  In Part I of his opinion, Justice Thomas renewed his unique view that the Establishment Clause ought not apply to state governments or to municipalities like the town of Greece.[146]  In Part II, Justice Thomas, joined by Justice Scalia, submitted that claims of religious coercion must be viewed through the prism of that which our Founders sought to escape: "religious orthodoxy . . . by force of law and threat of penalty."[147]  Justice Thomas proposed that only claims of actual *legal* coercion violate the Establishment Clause.[148]  Claims of subtle pressure, like requests to rise for prayer, would not offend this heightened standard.[149]

Against this framework, we consider plaintiffs' Establishment Clause challenges to (*a*) the House's guest chaplain policy and (*b*) the House's opening invocation practice.

### a.      Guest Chaplain Policy

Defendants maintain that legislative prayer is presumed constitutional unless employed to denigrate or proselytize.  According to defendants, plaintiffs' failure to allege an instance (much less a pattern) of proselytization or denigration is fatal to

---

[143] Id. at 1825-26.
[144] Id. at 1825-27.
[145] Id. at 1835-38 (Thomas, J., concurring in part and concurring in the judgment).
[146] Id. at 1835-37 (quoting Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 45-46 (2004) (Thomas, J., concurring in the judgment)).
[147] Id. at 1837 (emphasis omitted) (quoting Lee, 505 U.S. at 640).
[148] Id. at 1837-38 (quoting Newdow, 542 U.S. at 52).
[149] Id. at 1838.

their Establishment Clause claim.[150]  Defendants further contend that <u>Marsh</u> and <u>Town of Greece</u> cloak legislators with discretion to choose what type of prayer they would like to hear and from whom they would like to hear it.[151]  Defendants posit that purposeful exclusion of nontheists is consistent with the view of legislative prayer endorsed in <u>Marsh</u> and <u>Town of Greece</u>.[152]  Thus, according to defendants, it is entirely proper for the House to welcome only those religions which embrace a higher power and only those chaplains who will "appeal to the Almighty."[153]

Plaintiffs rejoin that they claim not disparagement or proselytization but discrimination, *viz.*, a practice by the House of preferring theistic faiths to the total and deliberate exclusion of nontheists.[154]  Plaintiffs emphasize that they do not seek to suppress God-oriented messages from the House floor, but to include their own messages among them.[155]

That the parties diverge on the contours of our inquiry is unsurprising.  The gravamen of the Supreme Court's legislative prayer decisions is clear: legislative prayer of even a sectarian genre survives judicial scrutiny unless it results from an impermissible motive.  Yet there is much uncertainty in the wake.  The majorities in <u>Marsh</u> and <u>Town of Greece</u> established what does *not* violate the Establishment Clause without drawing a bright line.  Each case plainly raised the constitutional bar—sanctioning first legislative prayer and then sectarian prayer, and extending

---

[150] Doc. 33 at 33-34.
[151] <u>Id.</u> at 30; <u>see</u> <u>also</u> Doc. 50 at 56:25-57:25.
[152] Doc. 39 at 2, 22.
[153] Doc. 50 at 56:25-57:25.
[154] <u>See</u> Doc. 36 at 11-20.
[155] Doc. 50 at 45:24-46:25.

those permissions from the state house to the town hall—but it is unclear exactly how high.

Plaintiffs' claims, however, do not necessitate a constitutional sea change. Rather, their claims present a novel set of facts to test the established principles of Marsh and Town of Greece. These principles are threefold. *First*, and most fundamentally, legislative prayer is permissible only so far as it "fits within the tradition long followed in Congress and the state legislatures."[156] This axiom informs any analysis under the Court's constituent holdings—that, *second*, sectarian legislative prayer is permissible absent a pattern of denigration, proselytization, or impermissible government purpose,[157] and *third*, government may not intentionally discriminate against religious minorities when selecting guest chaplains.[158] Plaintiffs claim that defendants violate the third of these precepts by maintaining a policy of discrimination against nontheists.

Defendants do not dispute that the House's implementation of Rule 17 prohibits nontheists from serving as chaplains.[159] Indeed, defendants' double down on that policy, asserting that it is the House's "prerogative" to determine the content of opening invocations.[160] Defendants contend the Town of Greece Court's directive of nondiscrimination is case specific because the town had endeavored to

---

[156] Town of Greece, 134 S. Ct. at 1819.
[157] Id. at 1824; see Marsh, 463 U.S. at 794-95.
[158] Town of Greece, 134 S. Ct. at 1824; see also Marsh, 463 U.S. at 793-95.
[159] See Doc. 33 at 30.
[160] See Doc. 33 at 1, 30; Doc. 39 at 15-26.

include a variety of creeds.[161]  That governments *may* choose to invite nontheist chaplains, defendants suggest, does not mean that all governments *must* do so.[162]

But the <u>Town of Greece</u> Court did not link its nondiscrimination mandate to the language of the town's policy.  *Per contra*, Justice Kennedy tethered the requirement to the Constitution itself: "So long as the town maintains a policy of nondiscrimination, the *Constitution* does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing."[163]  He further signaled that a policy which "reflect[s] an aversion or bias . . . against minority faiths" may violate this principle.[164]  The rule is a logical corollary to the settled edict that government may not "prescrib[e] prayers" with an aim to "promote a preferred system of belief or code of moral behavior."[165]

We reject the assertion that defendants may discriminate on the basis of religion simply because their internal operating rules do not proscribe it.  <u>Town of Greece</u> installs a new metric in the legislative prayer analysis: when a legislature opens its door to guest chaplains and other prayer givers, it may not purposefully

---

[161] Doc. 50 at 11:1-12:12, 14:7-19.
[162] <u>Id.</u> at 13:10-23, 15:3-15.
[163] <u>Town of Greece</u>, 134 S. Ct. at 1824 (emphasis added).
[164] <u>Id.</u>
[165] <u>Id.</u> at 1822 (citing <u>Engle v. Vitale</u>, 370 U.S. 421, 430 (1962)).

discriminate among them on the basis of religion.[166]  The complaint articulates a plausible violation of this tenet.  Plaintiffs allege that they are members of (or represent) minority religions, and that they have been purposefully excluded from the House's guest chaplain program on the basis of their beliefs.  They further allege that the House regularly opens its chamber to guest chaplains of more conventional faiths deemed suitable by the Speaker.  Plaintiffs plead a policy of religious discrimination sufficient to state a First Amendment claim.

Whether history and tradition sanctify the House's line of demarcation between theistic and nontheistic chaplains is a factual issue for a later day.  Establishment Clause issues are inherently fact-intensive, and we must resist the academic intrigue of casting the salient inquiry too narrowly at this juncture.  To the extent the parties' arguments evoke more nuanced constitutional questions— *e.g.*, whether plaintiffs practice "religion" and are capable of "praying," or whether tradition dictates that legislative prayer address a "higher power"—any such determination demands, and deserves, a fully developed record.  As it stands, plaintiffs' challenge to the House's legislative prayer policy survives Rule 12 scrutiny.

---

[166] Id. at 1824.  Only two appellate courts have explored the anti-discrimination principle since the Supreme Court decided Town of Greece in 2014.  A Fourth Circuit panel described the "policy of nondiscrimination" language as prohibiting the government from "favor[ing] one religious view to the exclusion of others."  Lund v. Rowan Cty., 837 F.3d 407, 423 (4th Cir. 2016) (citing Town of Greece, 134 S. Ct. at 1824; Marsh, 463 U.S. at 793).  And a Sixth Circuit panel held that "[e]xcluding unwanted prayers is discrimination" violative of the Establishment Clause.  Bormuth v. Cty. of Jackson, 849 F.3d 266, 290 (6th Cir. 2017).  Both decisions have been vacated for rehearing *en banc*.  See Bormuth v. Cty. of Jackson, __ F.3d __, 2017 WL 744030 (6th Cir. Feb. 27, 2017); Lund v. Rowan Cty., __ F. App'x __, 2016 WL 6441047 (4th Cir. Oct. 31, 2016).

### b.    Opening Invocation Practices

Resolution of plaintiffs' coercion claim requires us to identify the prevailing standard from the Court's split opinion on the constitutionality of a request to rise for an invocation in <u>Town of Greece</u>.  Our goal in parsing a fragmented decision of the Court is to distill "a single legal standard" that "produce[s] results with which a majority of the Justices . . . would agree."[167]  Courts may combine votes of dissenting Justices with plurality and concurring votes to establish a majority consensus.[168]  When no one rationale enjoys majority support, courts adopt the view of the members concurring in the judgment on the "narrowest grounds."[169]  Certain cases defy orderly classification; thus, the narrowest grounds rubric applies only when "one opinion can be meaningfully regarded as 'narrower' than another."[170]  If no opinion qualifies as the majority rule, lower courts are not bound by any particular standard.[171]

---

[167] <u>Binderup v. Att'y Gen.</u>, 836 F.3d 336, 356 (3d Cir. 2016) (first alteration in original) (quoting <u>United States v. Donovan</u>, 661 F.3d 174, 182 (3d Cir. 2011)); <u>Donovan</u>, 661 F.3d at 182 (quoting <u>Planned Parenthood of Se. Pa. v. Casey</u>, 947 F.2d 682, 693 (3d Cir. 1991), <u>rev'd on other grounds</u>, 505 U.S. 833 (1992)).

[168] <u>Binderup</u>, 836 F.3d at 356.

[169] <u>Id.</u>

[170] <u>Jackson v. Danberg</u>, 594 F.3d 210, 220 (3d Cir. 2010) (quoting <u>Berwind Corp. v. Comm'r of Soc. Sec.</u>, 307 F.3d 222, 234 (3d Cir. 2002)).

[171] <u>Id.</u>

The <u>Town of Greece</u> Court adjudged that a request to rise for an invocation did not amount to unconstitutional coercion under the Establishment Clause. The three-Justice plurality represents the narrowest grounds to that judgment.[172] It developed a standard which tests the facts of each coercion claim against the barometer of historical practices.[173] Justice Thomas, on the other hand, would wholly rescript our Establishment Clause benchmarks.[174] In other words, while the plurality rejected the particular coercion claim before it as factually deficient, Justice Thomas would reject nearly *all* coercion claims as *legally* deficient. We adopt Justice Kennedy's plurality opinion as the narrowest grounds on coercion.

The <u>Town of Greece</u> plurality tasks courts to review the contested practice to assess whether it is consonant with the tradition upheld in <u>Marsh</u> or whether coercion is indeed likely.[175] According to the plurality, coercion is a real likelihood when the government itself (1) directs public participation in prayers, (2) critiques dissenters, or (3) retaliates in its decisionmaking against those who choose not to participate.[176] All Justices agreed that the coercion analysis is "fact-sensitive."[177]

Plaintiffs Fields and Rhoades state a plausible coercion claim against this framework. At least two district courts have held that a public official's directive to

---

[172] The <u>Bormuth</u> court also adopted Justice Kennedy's plurality opinion as the majority rule. The court applied the Sixth Circuit's narrowest grounds standard, which considers which opinion represents "the least doctrinally far-reaching-common ground" and "the least change to the law." <u>Bormuth</u>, 849 F.3d at 279-81.

[173] <u>See</u> <u>Town of Greece</u>, 134 S. Ct. at 1825-27 (plurality opinion).

[174] <u>Id.</u> at 1835-38 (Thomas, J., concurring in part and concurring in the judgment).

[175] <u>Id.</u> at 1826-27 (plurality opinion) (Kennedy, J.).

[176] <u>Id.</u> at 1826.

[177] <u>Id.</u> at 1825; <u>id.</u> at 1838 (Breyer, J., dissenting); <u>id.</u> at 1851-52 (Kagan, J., dissenting); <u>see</u> <u>also</u> <u>id.</u> at 1828-29 (Alito, J., concurring).

stand and pray is materially distinct from the requests upheld in <u>Town of Greece</u>,[178] which were rendered not by the town board but guest chaplains "accustomed to directing their congregations in this way."[179] Fields and Rhoades each attend House daily sessions, and both have been exposed to the Speaker's directive to rise for opening invocations.[180] Moreover, both were subjected to reproach and humiliation on at least one occasion when the Speaker publicly singled them out for opting to remain seated.[181] Defendants' rejoinder that plaintiffs may choose not to participate rings hollow against a historical example of public censure for electing to do so.[182]

Defendants also adjure that the plurality opinion in <u>Town of Greece</u> must be limited to its circumstance, *viz.*, the intimate and interactive setting of a local government meeting.[183] Specifically, they aver that the increased risk of coercion motivating the plurality's approach does not attend prayer in a state house, where the public is isolated from the deliberative body and its activities.[184] Whether the state legislative chamber is distinct enough from town board meetings to make a constitutional difference cannot be determined without a factual record.[185] We will deny defendants' motion to dismiss Fields' and Rhoades' coercion claims.

---

[178] <u>Lund v. Rowan Cty.</u>, 103 F. Supp. 3d 712, 733 (M.D.N.C. 2015), <u>rev'd</u>, <u>Lund</u>, 837 F.3d 407, <u>vacated for reh'g *en banc*</u>, 2016 WL 6441047; <u>Hudson v. Pittsylvania Cty.</u>, 107 F. Supp. 3d 524, 535 (W.D. Va. 2015).

[179] <u>Town of Greece</u>, 134 S. Ct. at 1826 (plurality opinion).

[180] Doc. 1 ¶¶ 22-24, 60.

[181] <u>Id.</u> ¶¶ 23-24, 60.

[182] <u>See</u> Doc. 39 at 47.

[183] <u>Id.</u> at 40-45.

[184] <u>Id.</u> at 42-43.

[185] <u>See</u> <u>Town of Greece</u>, 134 S. Ct. at 1825 (plurality opinion).

One additional matter warrants discussion.  It is not entirely clear from the complaint whether all plaintiffs join in the coercion claim.  According to the *allegata*, only Fields and Rhoades have been exposed to coercive legislative prayer practices.[186]  The complaint does not indicate that any other plaintiff attended a House daily session, and counsel did not offer additional facts when asked at oral argument to detail the alleged coercion.[187]  This absence of exposure is fatal to any coercion claim.  To the extent any plaintiff other than Rhoades or Fields joins the coercion component of Count I, their claim must be dismissed.  Because plaintiffs ostensibly concede that Rhoades and Fields alone attended daily sessions, leave to amend is unnecessary.[188]

### 3.     *Free Speech, Free Exercise, and Equal Protection Clauses*

As noted *ante*, courts generally regard legislative prayer as "government speech."[189]  Courts have thus declined to entertain legislative prayer challenges cast under the Free Speech, Free Exercise, and Equal Protection Clauses.[190]  Within the realm of "government speech," the law is resolute that government can "say what it wishes" subject only to the Establishment Clause and the will of "the electorate and

---

[186] Doc. 1 ¶¶ 22-24, 60.

[187] See Doc. 50 at 43:15-44:19.

[188] See Doc. 1 ¶¶ 22-24, 60; Doc. 36 at 8-9, 31, 43-44; see also Fletcher-Harlee Corp., 482 F.3d at 251; Grayson, 293 F.3d at 108.

[189] See Lund, 837 F.3d at 413; Simpson, 404 F.3d at 287-88; Coleman, 104 F. Supp. 3d at 890-91.

[190] See, e.g., Simpson, 404 F.3d at 287-88; Coleman, 104 F. Supp. 3d at 890-91; Atheists of Fla., Inc., 779 F. Supp. 2d at 1341-42 (quoting Simpson, 404 F.3d at 288); see also Turner, 534 F.3d at 356 (O'Connor, J., sitting by designation) (quoting Simpson, 404 F.3d at 288).

the political process."[191]  On this basis, defendants ask the court to dismiss plaintiffs'

legislative prayer claims pursuant to the Free Speech, Free Exercise, and Equal

Protection Clauses.

Plaintiffs reply that case law construing legislative prayer as government

speech either predates Town of Greece or fails to account for it.[192]  They theorize

that Town of Greece "tightly circumscribes" the permissible content of legislative

prayer such that the practice has lost its status as "government speech."[193]  As we

conclude elsewhere in this opinion, Town of Greece does not reduce the standard

for legislative prayer cases—*a contrario*, the decision expands permissible content

by sanctioning even sectarian religious messages.  History and precedent bestow

special status upon legislative prayer, and neither Marsh nor Town of Greece

diminish that status.

Nor do we agree with plaintiffs' assertion that legislative prayer is "hybrid

speech" subject to lesser scrutiny.  Plaintiffs cite a Fourth Circuit decision, W.V.

Association of Club Owners & Fraternal Services v. Musgrave, 553 F.3d 292 (4th Cir.

2009), for its proposition that hybrid speech "has aspects of both private speech and

government speech."[194]  Not only is Musgrave factually distinct (concerning state-

licensed video lottery machines placed in privately-owned bars), it is authored

---

[191] Pleasant Grove City v. Summum, 555 U.S. 460, 467-69 (2009).
[192] See Doc. 36 at 36-40.
[193] Id. at 37.
[194] W.V. Ass'n of Club Owners & Fraternal Servs. v. Musgrave, 553 F.3d 292, 298 (4th
Cir. 2009).

by the same jurist who concluded three years earlier that citizen-led legislative invocations are "government speech 'subject *only* to the proscriptions of the Establishment Clause.'"[195]

We join the unanimous consensus of courts before us to conclude that legislative prayer is subject to review under the Establishment Clause alone. Hence, we will grant defendants' motion to dismiss plaintiffs' Free Speech, Free Exercise, and Equal Protection claims.

**IV.    <u>Conclusion</u>**

The court will grant in part and deny in part defendants' motion to dismiss, as stated more fully herein.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        April 28, 2017

---

[195] <u>Simpson</u>, 404 F.3d at 287-88 (emphasis added).