## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN FIELDS,** *et al.,* | : | **CIVIL ACTION NO. 1:16-CV-1764** |
| | : | |
| **Plaintiffs** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **SPEAKER OF THE PENNSYLVANIA** | : | |
| **HOUSE OF REPRESENTATIVES,** | : | |
| *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

We begin by delineating what the issue in this case is and what it is not. This matter concerns the constitutionality of a policy regarding who may present invocations at the commencement of a legislative session. It is not a challenge to the religious content of legislative prayer. To the contrary, it is well settled that sectarian prayers are entirely proper invocations for legislative sessions.

The Pennsylvania House of Representatives opens legislative sessions with an invocation delivered by a member of the House or a guest chaplain. The Speaker of the House maintains a guest chaplain policy that categorically excludes those who would present an uplifting message of hope, mutual respect, and peace yet—based upon their nontheistic beliefs—would fail to incorporate theistic entreaties to a divine or higher power. Each of the individual plaintiffs desires to deliver an opening invocation before the House. The Speaker has denied plaintiffs this opportunity due solely to the nontheistic nature of their beliefs. In light of the Supreme Court's decision in <u>Town of Greece</u>, we find that the House policy violates

the Establishment Clause of the First Amendment to the United States

Constitution.

## I. **Factual Background and Procedural History**[1]

Plaintiffs Brian Fields, Paul Tucker, Deana Weaver, Scott Rhoades, Joshua

Neiderhiser, Rev. Dr. Neal Jones, and Richard Kiniry are nontheist Pennsylvania

residents.[2,3]  (Doc. 90 ¶ 16).  They desire to act as guest chaplains and deliver

nontheistic invocations at House sessions.  (Id. ¶ 39).  Plaintiffs aver that such

invocations would not proselytize or disparage any faith and would be "positive,

uplifting, unifying, and respectful toward all—similar to moving and inspiring

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 81, 90, 92, 97).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.

[2] Fields, Tucker, Rhoades, and Neiderhiser identify both as Humanists and as atheists or agnostics; Rev. Dr. Jones identifies as a Unitarian Universalist, Humanist, and agnostic; Weaver identifies as a Freethinker; and Kiniry identifies as an Ethical Humanist (also known as an Ethical Culturist).  (Doc. 90 ¶ 16).  Four plaintiffs are ordained clergy or clergy-like members: Rhoades and Neiderhiser are ordained Humanist Celebrants, Rev. Dr. Jones is a Unitarian Universalist senior minister, and Kiniry is an Ethical Humanist Clergy Leader.  (Id. ¶¶ 25, 34).

[3] Other named plaintiffs include Pennsylvania Nonbelievers, Inc., Dillsburg Area FreeThinkers, Lancaster Freethought Society, and Philadelphia Ethical Society.  For purposes of this opinion, "plaintiffs" will be used primarily to refer to all individual plaintiffs, but occasionally will also be used to refer to all named plaintiffs.

invocations that have been delivered by nontheists at many governmental meetings around the country, which have invoked authorities or principles such as the Founding Fathers, the U.S. Constitution, democracy, equality, inclusion, fairness, and justice." (<u>Id.</u>) Interestingly, plaintiff Weaver has given just such an invocation in the Pennsylvania Senate, invoking ideals of compassion, understanding, and tolerance. (<u>Id.</u> ¶ 40).

## A.     The Opening Invocation

The Pennsylvania House of Representatives opens most of its daily legislative sessions with an invocation delivered by either a House member or an invited guest chaplain.[4] (<u>Id.</u> ¶ 1). After calling the House to order, the Speaker of the House announces the invocation presenter, and, if a guest chaplain, the name of the presenter's church or organization and the name of the sponsoring representative. (<u>Id.</u> ¶ 2). The Speaker then requests that everyone in the chamber rise for the invocation, after which the presenter delivers the invocation from the Speaker's position on the Speaker's rostrum. (<u>Id.</u>) The Pledge of Allegiance immediately follows. (Doc. 81 ¶¶ 6, 38).

---

[4] Defendants dispute the use of the term "invocation" and assert that House sessions begin with a "prayer." (Doc. 97 ¶ 1). We will use the terms "prayer" and "invocation" interchangeably throughout this opinion, following the example of the Supreme Court in <u>Town of Greece v. Galloway</u>, 572 U.S. __, 134 S. Ct. 1811 (2014), and <u>Marsh v. Chambers</u>, 463 U.S. 783 (1983), as well as other federal courts addressing legislative prayer questions. <u>See</u>, <u>e.g.</u>, <u>Lund v. Rowan County</u>, 863 F.3d 268 (4th Cir. 2017) (<u>en banc</u>), <u>cert.</u> <u>denied</u>, 138 S. Ct. 2564 (2018) (mem.); <u>Hudson v. Pittsylvania County</u>, 107 F. Supp. 3d 524 (W.D. Va. 2015).

Guest chaplains, if inclined, are permitted to bring additional guests to sit in the House chamber during the invocation, and one or two of the guests may sit on the raised dais along with the invocation giver and other House leaders. (Doc. 90 ¶¶ 4-5). Before delivering the invocation, guest chaplains usually meet the Speaker, the Parliamentarian of the House, and their representative. (Id. ¶ 7). Guest chaplains also receive a commemorative gavel, a photograph with the Speaker and their representative, a thank-you letter from the Speaker, and recognition on social media by the Speaker's office. (Id. ¶ 9). Guest chaplains testified that they consider the opportunity to be an honor. (Id. ¶ 3).

**B.      The Guest Chaplain Policy**

Beginning in 1865 and continuing largely uninterrupted until 1994, the House annually or biannually appointed a permanent chaplain to deliver the opening invocation. (Doc. 81 ¶¶ 3-4; Doc. 77-7 at 67, Expert Report and Decl. of Professor Paul Finkelman, Ph. D. ("Expert Rpt.") at 17). During the following ten years, the House invited guest chaplains occasionally in addition to using monthly rotating chaplains. (Expert Rpt. at 17). The House began frequently utilizing guest chaplains or House members to deliver the opening invocation around 2004. (Doc. 81 ¶ 5; Doc. 92 ¶ 5; Expert Rpt. at 17). By 2008, the House had established the current practice of exclusively inviting guest chaplains or having House members deliver the invocation. (Expert Rpt. at 17-18).

Representatives nominate potential guest chaplains by passing their names along to the Speaker's office. (Doc. 81 ¶ 10). Those interested in giving the invocation may also petition the Speaker's office directly. (Id.) Additionally, House

staff may recommend guest chaplains. (Doc. 92 ¶ 10; Doc. 90 ¶ 13). The Speaker's office performs "non-intrusive background research" on proposed guest chaplains "to ensure compliance with House Rules and avoid any public[-]relations issues." (Doc. 81 ¶ 12). The Speaker's office is responsible for selection of guest chaplains. (Doc. 90 ¶ 60). Selected guest chaplains receive a standard letter explaining that "[t]here are 203 members of the House coming from a wide variety of faiths," asking the guest chaplain to "craft a prayer that is respectful of all religious beliefs," and noting that "efforts to deliver an inter-faith prayer are greatly appreciated." (Doc. 81 ¶ 13; Doc. 64-2 at 2).

House Rule 17 states, in pertinent part, that "[t]he Chaplain offering the prayer shall be a member of a regularly established church or religious organization or shall be a member of the House of Representatives." GEN. OPERATING RULES OF THE PA. HOUSE OF REP. R. 17. The House, through its interpretation of House Rule 17 and particularly the word "prayer," has established a policy that permits only guest chaplains who adhere to, or are members of a religious organization that subscribes to, a belief in "God" or a "divine" or "higher" power. (Doc. 90 ¶ 44; Doc. 77-3 at 15-28, Myer Dep. 10:15-23:11 ("Myer Dep."); Doc. 77-4 at 29-39, Turzai Dep. 15:5-25:4 ("Turzai Dep."); Doc. 77-5 at 4-20, Smith Dep. 12:13-28:25 ("Smith Dep.")). As defendants describe the policy, "the opportunity to offer the prayer is dependent upon the prayer-giver's willingness to . . . provide a theistic communication to God or a higher power seeking blessing, guidance, or inspiration." (Doc. 58 at 5). The Parliamentarian plays a key role in determining whether a potential guest chaplain qualifies under this House policy. (Myer Dep. 9:6-19). The Speaker, however, is

ultimately responsible for interpreting the House Rules and for deciding whether someone is qualified to serve as guest chaplain. (Turzai Dep. 10:15-16, 11:5-9).

Guest chaplains are given priority over House members in presenting the invocation, but the House does not receive enough requests to enable a guest chaplain to deliver the opening prayer before every session. (Doc. 90 ¶ 65). From January 2008 to July 2017, approximately half the House invocations were delivered by guest chaplains and half were delivered by House members. (Id. ¶¶ 10, 65). The vast majority of guest chaplains represented Christian denominations, and all represented monotheistic faiths or delivered monotheistic invocations. (Id. ¶ 10). Only two prayers over this period represented religious traditions other than Christianity, Judaism, or Islam: one delivered by a Sikh guest chaplain in 2017, and one Native American invocation delivered by a Christian House member in 2015. (Id. ¶ 11). Most guest chaplains during this time period were ordained clergy; others included prison, police, healthcare, and military chaplains; a missionary; a college chancellor; a member of a religious healthcare sisterhood; a lay president of a Jewish temple; and a person unaffiliated with a particular religious organization. (Id. ¶ 12).

### C. Plaintiffs' Invocation Requests and Denials

In August 2014, Weaver emailed then-Representative Mike Regan on behalf of Dillsburg Area FreeThinkers, requesting an opportunity for someone from the organization to deliver the opening prayer. (Doc. 81 ¶ 28). Several weeks later, Carl Silverman (a non-party to this litigation) sent correspondence on Pennsylvania Nonbelievers' letterhead to then-Representative Glen Grell, copying the Speaker,

the Parliamentarian, and Fields, requesting that either Silverman or Fields be permitted to deliver an opening invocation. (Id. ¶ 29). Both requests were denied. (Id. ¶ 31). In a letter dated September 25, 2014, then-Speaker Samuel Smith told Silverman that the House "would not honor" the request for a member of Pennsylvania Nonbelievers to serve as guest chaplain. (Doc. 64-5 at 3). The letter explained that the House did "not believe that governmental bodies are required to allow non-adherents or nonbelievers the opportunity to serve as chaplains." (Id.) Representative Regan responded to Weaver's email request with a copy of the September 25, 2014 letter, explaining only that "[t]his [letter] was forwarded to all legislative offices relative to an atheist offering the opening of session." (Doc. 64-6). Thereafter, the House approved its 2015-2016 General Operating Rules, which amended House Rule 17 to require that every guest chaplain "shall be a member of a regularly established church or religious organization or shall be a member of the House of Representatives." (Doc. 90 ¶ 42; Doc. 64-8); GEN. OPERATING RULES OF THE PA. HOUSE OF REP. R. 17.

On January 9, 2015, plaintiffs' counsel sent a letter to the Speaker and Parliamentarian requesting that a member of Pennsylvania Nonbelievers be allowed to deliver the House's opening invocation. (Doc. 81 ¶ 32; Doc. 92 ¶ 32; Doc. 64-7). The Parliamentarian denied the request, referencing the September 25, 2014 letter from Speaker Smith and also citing the recent amendment to House Rule 17. (Doc. 81 ¶ 33; Doc. 64-8). Plaintiffs' counsel subsequently sent separate letters to the Speaker, the Parliamentarian, and various representatives on behalf of Fields, Tucker, Weaver, Rhoades, Neiderhiser, Pennsylvania Nonbelievers, Dillsburg Area

FreeThinkers, and Lancaster Freethought Society, requesting that the individuals named therein be permitted to deliver a nontheistic opening invocation. (Doc. 81 ¶ 34; Doc. 92 ¶ 34; Doc. 77-21 at 11-21). The Parliamentarian denied the requests. (Doc. 81 ¶ 35). In his denial letter, the Parliamentarian emphasized House Rule 17 and its recent amendment and concluded that "[t]he individuals about whom you inquired do not meet the requirements of House Rule 17." (Doc. 64-14). The letter did not specify how the individuals failed to satisfy the requirements of House Rule 17. (Id.)

On May 19, 2017, plaintiffs' counsel sent a similar letter on behalf of Rev. Dr. Jones, Kiniry, and the Philadelphia Ethical Society. (Doc. 81 ¶ 36; Doc. 77-21 at 32-33). This time, the Parliamentarian's denial letter indicated that "[b]ecause the individuals and organization you represent are unwilling to offer a prayer appealing to a higher power, they do not meet the requirements under House Rule 17. We therefore need not address whether they are members of a regularly established church or religious organization." (Doc. 77-21 at 38).

### D. The House's Opening Invocation Practices

Before the invocation and Pledge of Allegiance, the Speaker calls the House to order and, typically, introduces the guest chaplain. (Doc. 90 ¶¶ 73, 75). The Speaker then states, "Members and guests, please rise as able," pounds his gavel three times, and steps aside to allow the guest chaplain to deliver the prayer from the Speaker's rostrum. (Id. ¶ 75).

The Speaker's present practice differs from that in effect at the time this litigation commenced. Prior to January 2017, the Speaker simply stated, "Members

and all guests, please rise." (Id. ¶ 77). The House at that time maintained a policy that visitors in the gallery must stand for the opening prayer. (Id. ¶ 81; Doc. 77-20 at 48-66; Doc. 77-25 at 36). When visitors did not stand, a Sergeant at Arms (otherwise known as a legislative security officer) would sometimes approach seated visitors and tell them to follow the Speaker's directive to stand. (Doc. 90 ¶ 81; Doc. 77-2 at 16, 54; Myer Dep. 99:1-100:5, 102:20-23, 103:14-22; Smith Dep. 58:6-18; Doc. 77-20 at 48, 65-66; Doc. 77-25 at 36-37). Fields and Rhoades attended a House session in February 2012 and chose to remain seated after the Speaker's directive to rise for the opening invocation. (Doc. 77-2 at 16, 54). Both recalled that a Sergeant at Arms approached them in the gallery and loudly and repeatedly directed them to stand.[5] (Id.) The Parliamentarian testified that he had not been aware of the Sergeants at Arms' practice and that this policy was changed in January 2017 "mostly because of the [current] litigation." (Myer Dep. 100:3-11).

Posted signage also addresses visitors' conduct during House sessions. A sign located directly outside the visitors' gallery states, "Session days begin with an inter-faith prayer and the pledge of allegiance. All guests who are able are requested to stand during this order of business." (Doc. 90 ¶¶ 71-72). Prior to October 16, 2017, the sign was nearly identical except that the word "physically" appeared before the word "able." (Id.)

---

[5] After discovery, plaintiffs abandoned their allegations that the Speaker publicly singled out Fields and Rhoades for refusing to stand during the invocation. (See Doc. 101 at 20; Doc. 64 ¶¶ 24, 60).

### E. Procedural History

Plaintiffs commenced this action in August 2016. In their original complaint, plaintiffs named as defendants the Speaker, the Parliamentarian, and five House representatives in their official capacities. Plaintiffs asserted claims under the Establishment, Free Exercise, and Free Speech Clauses of the First Amendment, and under the Equal Protection Clause of the Fourteenth Amendment. Defendants moved to dismiss the complaint in its entirety.

After briefing and oral argument, we dismissed the Free Exercise, Free Speech, and Equal Protection claims but permitted the Establishment Clause challenges—both to the House guest chaplain policy and the opening invocation practices—to proceed. In July 2017, plaintiffs amended their complaint to include three additional plaintiffs (Rev. Dr. Jones, Kiniry, and the Philadelphia Ethical Society) and four additional defendants (the House Director of Special Events and three other House representatives).[6] Discovery is complete, and the parties have filed cross-motions for summary judgment. After extensive and excellent briefing, the motions are ripe for disposition.

## II. Legal Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a

---

[6] As of this writing, the Speaker of the House is the Honorable Mike Turzai, the Parliamentarian is Clancy Myer, and the Honorable Dawn Keefer, Carol Hill-Evans, Steven Mentzer, Alexander Charlton, Duane Milne, Brian Sims, Will Tallman, and Seth Grove serve as representatives of House Districts 92, 95, 97, 165, 167, 182, 193, and 196, respectively. See MEMBERS OF THE HOUSE OF REPRESENTATIVES, http://www.legis.state.pa.us/cfdocs/legis/home/member _information/pdf/addr_hse.pdf (updated Aug. 3, 2018).

jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently. See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. Fed. Express Corp., 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

### III. __Discussion__

The facts in this case are largely undisputed. Two legal questions remain: *first*, whether the House guest chaplain policy that facially discriminates against nontheistic religions violates the Establishment Clause of the First Amendment to the United States Constitution; and *second*, whether the pre-2017 or current iteration of the House opening invocation practices involving directives to stand for

prayer are unconstitutionally coercive and violative of the Establishment Clause. We will address these difficult issues *seriatim*.

### A. Establishment Clause Challenge to House Guest Chaplain Policy

Plaintiffs contend that the House guest chaplain policy violates the Supreme Court of the United States' recent Town of Greece decision and other long-held Establishment Clause principles. They argue that the policy, which intentionally excludes nontheists and nontheistic belief systems, cannot pass constitutional muster even in the *sui generis* legislative prayer context. Plaintiffs maintain that the policy contravenes Town of Greece because it discriminates based on the prospective guest chaplain's religious beliefs and results in state officials prescribing what beliefs may be expressed in invocations.

Defendants counter that the House policy is grounded in the longstanding tradition of offering theistic opening prayers. They posit that the policy does not offend the Establishment Clause because adherents to multiple different religious beliefs are welcome to serve as guest chaplains. According to defendants, the House's purposeful exclusion of nontheistic religions is permissible because the policy allows guest chaplains from many different theistic faiths and thus does not have the effect of favoring or establishing one particular religion.

The First Amendment prohibits the government from making any law "respecting an establishment of religion." U.S. Const. amend. I. As we have previously explained, legislative prayer occupies distinct space in Establishment Clause jurisprudence. Only two Supreme Court cases directly address the subject: Marsh v. Chambers, 463 U.S. 783 (1983), and Town of Greece v. Galloway, 572 U.S.

__, 134 S. Ct. 1811 (2014).  In both cases, the Court upheld state and municipal prayer practices without application of traditional Establishment Clause principles. Accordingly, we review the instant legislative prayer challenge through the unique prism of Marsh and Town of Greece.

## 1. *Legislative Prayer Under Marsh and Town of Greece*

Our Rule 12(b) opinion examined the Supreme Court's legislative prayer jurisprudence *in extenso*.  Fields v. Speaker of the Pa. House of Reps., 251 F. Supp. 3d 772, 784-87 (M.D. Pa. 2017) (Conner, C.J.).  Several salient principles must be reiterated in order to address the parties' Rule 56 arguments.

In Marsh v. Chambers, the Court rejected a constitutional challenge to the Nebraska state assembly's repetitive appointment of a Presbyterian minister as chaplain.  Marsh, 463 U.S. at 784-85.  The Court observed that legislative prayer is diffuse in our nation's history, noting that the First Congress appointed legislative chaplains during the same week it drafted the Bill of Rights.  Id. at 787-88.  The Court held that an "unambiguous and unbroken history of more than 200 years" of legislative prayer had woven the ritual into the very "fabric of our society."  Id. at 792.  It concluded that "[t]o invoke Divine guidance" before legislative sessions is not establishment of religion but "a tolerable acknowledgement of beliefs widely held" among citizens.  Id.  The Court also found that, barring an "impermissible motive," the lengthy tenure of a minister of a single faith was not problematic.  Id. at 793-94.  As to concerns with the principally Judeo-Christian nature of the prayers, the Court resolved that content is of no moment when "there is no

indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." Id. at 794-95.

In County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573 (1989), the Court determined that the display of a crèche on public property violated the Establishment Clause. See County of Allegheny, 492 U.S. at 603. Tasked to harmonize its decision with Marsh, the majority contrasted the "specifically Christian symbol" of a crèche with the general religious references offered by the Nebraska chaplain. See id. at 602-05. Following County of Allegheny, some courts construed Marsh to authorize only nonsectarian legislative prayer. See, e.g., Joyner v. Forsyth County, 653 F.3d 341, 349-50 (4th Cir. 2011); Wynne v. Town of Great Falls, 376 F.3d 292, 298-302 (4th Cir. 2004).

Recently, the Court thoroughly examined legislative prayer practices in Town of Greece v. Galloway, 572 U.S. __, 134 S. Ct. 1811 (2014). The town of Greece, New York, invited local clergy to offer invocations before monthly board meetings. Town of Greece, 134 S. Ct. at 1816. A clerical employee selected presenters by contacting congregations listed in a local directory. Id. Town leaders described their policy as welcoming ministers and laypersons "of any persuasion," including atheists, but in practice, nearly all invocations from 1999 to 2007 were Christian in nature. See id. After two local residents objected to the homogenous nature of the prayers, the town invited a Jewish layman, the chairman of a local Baha'i temple, and a Wiccan priestess to serve as presenters, but subsequently reverted to Christian themes. Id. The two objectors filed suit, asserting that the town violated the Establishment Clause by permitting sectarian prayer and by fostering a

coercive environment where attendees felt pressured to participate in religious observances. <u>Id.</u> at 1817, 1819-20.

In an opinion authored by Justice Kennedy, the Court addressed plaintiffs' claims in two parts, with the first (Part II-A) garnering majority support. Justice Kennedy, joined by the Chief Justice as well as Justices Thomas, Alito, and Scalia, held that the Establishment Clause permits sectarian legislative prayer. <u>See id.</u> at 1820-24. Following a distillation of <u>Marsh</u>, the Court identified the essential inquiry as whether the practice at issue "fits within the tradition long followed in Congress and the state legislatures." <u>Id.</u> at 1819. That tradition, the Court held, does not mandate ecumenical or nonsectarian prayer. <u>Id.</u> at 1820-21. In closing, the majority observed that a prayer practice will not likely violate the Establishment Clause unless it reflects a pattern of denigration or proselytization or an otherwise impermissible purpose. <u>Id.</u> at 1824. The Court nonetheless cautioned that history and tradition cannot save an otherwise unconstitutional practice. <u>Id.</u> at 1819.

The majority then addressed whether the town had violated the Establishment Clause by inviting "predominantly Christian" invocation presenters. <u>Id.</u> at 1824. The Court held that "[s]o long as the town maintains a policy of nondiscrimination," the Establishment Clause does not require it to actively seek out diverse prayer givers from beyond its borders. <u>Id.</u> The Court emphasized that the record contained no evidence of "aversion or bias" toward minority faiths and that, contrarily, the town undertook reasonable efforts to identify all prospective presenters, welcoming ministers and laity of all creeds. <u>Id.</u>

Part II-B of Justice Kennedy's opinion was joined only by the Chief Justice and Justice Alito. The three-Justice plurality opined that religious coercion claims necessitate careful examination of both setting and audience. Id. at 1825 (plurality opinion). As for setting, the Justices stated that a "brief, solemn and respectful prayer" is consistent with "heritage and tradition" familiar to the public, and that attendees understand that the purpose of the prayer is to "lend gravity" to the proceedings. Id. Concerning audience, the plurality found that the messages were intended to "accommodate the spiritual needs of lawmakers" rather than preach to the public. Id. at 1825-26. Under such conditions, the plurality concluded, there was no unconstitutional coercion. Id. at 1825-27.

### 2. *Historical Practices and Tradition*

Town of Greece makes clear that a court examining the constitutionality of a legislative prayer practice must determine whether that practice "fits within the tradition long followed in Congress and the state legislatures." Town of Greece, 134 S. Ct. at 1819. Defendants maintain that historical practices and tradition are on their side. They view the House's interpretation of "prayer" as consistent with the traditional understanding of that term as it appears in Supreme Court jurisprudence. Defendants further cite the long history of primarily theistic invocations given in Congress and state legislatures.

After Town of Greece, the permissibility of sectarian content in legislative prayers is no longer a matter of debate. Defendants argue that their invocation policy is entirely consistent with the general tradition of sectarian legislative prayer incorporating theistic themes. But sectarian content is *not* the issue. Our inquiry

must focus on the "prayer opportunity as a whole," Town of Greece, 134 S. Ct. at 1824, which includes the prayer-giver selection process, id.; Marsh, 463 U.S. at 793-94; Pelphrey v. Cobb County, 547 F.3d 1263, 1282 (11th Cir. 2008). The House's selection process invites members of the public to serve as guest chaplains but draws a qualifying line of demarcation between theistic and nontheistic belief systems. This is a horse of a different color from prayer practices previously found to be consistent with history and tradition.

Professor Finkelman's comprehensive report confirms that neither federal nor state legislative history supports defendants' intentional exclusion of nontheistic guest chaplains. Except for several years in the mid-19th century, the United States Senate and House of Representatives have always appointed permanent chaplains. (Expert Rpt. at 8). Guest chaplains did not exist at the federal level until 1855. (Id. at 14). There is no historical evidence of nontheists requesting, or being denied the opportunity, to give the invocation in either chamber of Congress. (Id. at 19). As Professor Finkelman notes, this is most likely because, in the 17th, 18th, and 19th centuries, those who did not believe in the existence of God were afraid to let their beliefs become public due to the threat of "severe physical punishment[]" as well as imprisonment. (Id. at 19-21).

Defendants correctly observe that history and tradition convincingly support sectarian and theistic content in legislative prayers. Indeed, the Town of Greece Court relied on this history to buttress its decision. Town of Greece, 134 S. Ct. at 1818-24. But defendants have produced little, if any, evidence that the House's "specific practice is permitted" or "was accepted by the Framers and has withstood

the critical scrutiny of time and political change." Id. at 1819 (quoting County of Allegheny, 492 U.S. at 670 (Kennedy, J., concurring in judgment in part and dissenting in part)). That history has tolerated the natural prevalence of theistic legislative prayer is hardly evidence that the Framers would abide deliberate and categorical exclusion of nontheists. Accordingly, the House's prayer practice finds no refuge in history and tradition.

> **3.** ***Defendants' Additional Arguments in Support of the House's Prayer Practice***

Defendants raise several additional arguments to justify the House's guest chaplain policy. They assert that the policy does not establish a single religious viewpoint, that nontheists cannot satisfy House requirements or the purposes of legislative prayer, and that prohibiting screening would eliminate the House's ability to regulate the invocations.

> **a.** <u>**Policy Does Not Establish a Single Religious Viewpoint**</u>

Defendants posit that there are only three ways that a legislative prayer practice can violate the Establishment Clause: "open proselytization, blatant disparagement [of other faiths], or the government's alignment with a *particular* sect or creed." (Doc. 82 at 20-21). Stated differently, a prayer practice which does not proselytize or disparage will offend the Establishment Clause only if it affiliates the government with a "*single* religious perspective." (Id. at 55-60 (emphasis added)). Defendants argue that because plaintiffs do not allege disparagement or proselytization, the instant prayer practice must be found constitutional as it does not align the government with one religious viewpoint. (Doc. 100 at 15).

We reject this argument for three reasons. *First*, <u>Town of Greece</u> provides legislative prayer guidance that cannot be reconciled with defendants' argument.[7] *Second*, defendants' reasoning would result in outcomes antithetical to the purposes undergirding the Establishment Clause. And *third*, of the two legislative prayer decisions issued after <u>Town of Greece</u> that discuss intentional discrimination in invocation-presenter selection, one is closely analogous and well-reasoned while the other is entirely unpersuasive.

i.     **<u>Town of Greece</u> Nondiscrimination Guidance**

Intentional discrimination on the basis of religion when selecting guest chaplains was not directly before the Court in <u>Town of Greece</u>. Nonetheless, the Court highlighted the nondiscriminatory practices of the town and the United States Congress, as well as the potential constitutional problems with legislative prayer policies that intentionally discriminate against minority faiths.

In its relatively short recitation of facts, the Court was careful to note that "[t]he town at no point excluded or denied an opportunity to a would-be prayer giver" and that, under the town's policy, "a minister or layperson of any persuasion, including an atheist, could give the invocation." <u>Town of Greece</u>, 134 S. Ct. at 1816, 1824. The Court further noted that after receiving complaints, "the town invited a Jewish layman and the chairman of the local Baha'i temple to deliver prayers" in

---

[7] Plaintiffs also cite to <u>Pelphrey v. Cobb County</u>, 547 F.3d 1263 (11th Cir. 2008). The <u>Pelphrey</u> court reviewed an intentionally discriminatory invocation-presenter policy and held that "the categorical exclusion of certain faiths based on their beliefs is unconstitutional." <u>Pelphrey</u>, 547 F.3d at 1282. Although <u>Pelphrey</u> predates <u>Town of Greece</u> and is non-binding as an out-of-circuit decision, its persuasive *ratio decidendi* is consonant with our holding *sub judice*.

addition to granting a Wiccan priestess's request to give the invocation.  Id. at 1817.

Recounting the district court's ruling, the Court highlighted that the district court

had "found no impermissible preference for Christianity, noting that the town had

opened the prayer program to all creeds and excluded none."  Id.  The Court stated

that, in its view, the fact that most invocation presenters were Christian reflected

"only the predominantly Christian identity of the town's congregations, rather than

an official policy or practice of discriminating against minority faiths."  Id.

The Court reviewed the historical practices and understandings of legislative

prayer, underscoring that in the 1850s, the chaplain policies of United States House

of Representatives and Senate were found to pose no threat to the Establishment

Clause in part because "no faith was excluded by law, nor any favored[.]"  Id. at

1819.  The Court observed that Congress "acknowledges our growing diversity not

by proscribing sectarian content but by welcoming ministers of many creeds,"

citing congressional invocations given by a Buddhist monk, a Jewish Rabbi, a

Hindu Satguru, and an Islamic Imam.  Id. at 1820-21.

As we observed at the Rule 12 stage, the Court repeatedly admonished

against intentional discrimination in prayer practices.  Justice Kennedy, writing for

the majority and addressing the issue of diversity among presenters, explained that

"*[s]o long as the town maintains a policy of nondiscrimination*, the Constitution does

not require it to search beyond its borders for non-Christian prayer givers in an

effort to achieve religious balancing."  Id. at 1824 (emphasis added).  He signaled

that a policy that "reflect[s] an aversion or bias . . . against minority faiths" may be

constitutionally suspect.  Id.  Addressing the issue of sectarian versus nonsectarian

content, Justice Kennedy explained: "The First Amendment is not a majority rule, and government may not seek to define permissible categories of religious speech. *Once it invites prayer into the public sphere*, government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." Id. at 1822-23 (emphasis added).

In a concurring opinion, Justice Alito similarly emphasized that plaintiffs had not claimed the principally Christian composition of the pool of invocation presenters was "attributable to religious bias or favoritism" or "religious animus." Id. at 1829 (Alito, J., concurring) (citation and internal quotation marks omitted). He stressed that when complaints were made, "the town made it clear that it would permit any interested residents, including nonbelievers, to provide an invocation, and the town has never refused a request for an invocation." Id. Justice Alito observed that although some Jewish residents who attended synagogues outside the town's borders were not represented by the town's unsophisticated selection process, id. at 1830, the mistake was "at worst careless, and it was *not done with discriminatory intent*," id. at 1831 (emphasis added). He cautioned that he would view the case "very differently" if the town had intentionally omitted the synagogues. Id.

That the Supreme Court has not yet weighed in on the constitutionality of an invocation practice like the one before us is not surprising. From the Founding era to present day, the Court has directly considered constitutional limitations on legislative prayer just twice. Moreover, much of the above-quoted

language from <u>Town of Greece</u> is *dicta*: the question of intentional religious discrimination in guest chaplain selection was not squarely before the Court. <u>See</u> <u>United States v. Warren</u>, 338 F.3d 258, 265 (3d Cir. 2003) (quoting Rupert Cross, Precedent in English Law 80 (2d ed. 1968)). Yet the Third Circuit has repeatedly observed that *dicta* in Supreme Court opinions "'are highly persuasive' and are not to be viewed lightly." <u>Sheet Metal Workers Int'l Ass'n Local Union No. 27 v. E.P. Donnelly, Inc.</u>, 737 F.3d 879, 892 n.18 (3d Cir. 2013) (quoting <u>Galli v. N.J. Meadowlands Comm'n</u>, 490 F.3d 265, 274 (3d Cir. 2007)). Disregarding persuasive statements from the Supreme Court imperils a lower court's analysis and rulings. <u>Galli</u>, 490 F.3d at 274. This is especially true when there are only two Supreme Court cases on the subject.

We find it significant that both Justice Kennedy (writing for the majority) and Justice Alito (joined by the late Justice Scalia) expressed concern with intentional discrimination against minority religions in a legislative prayer practice. The fact that their remarks were not dispositive of the ultimate issues in <u>Town of Greece</u> does not make their admonitory words any less compelling in the matter *sub judice*. When these Justices repeatedly warned against intentional discrimination on the basis of religion, we believe they presaged disposition of the instant matter.

### ii. Defendants' Interpretation Offends the Purposes of the Establishment Clause

Defendants' restrictive interpretation of legislative prayer jurisprudence also transgresses the purposes of the Establishment Clause. Under defendants' interpretation, deliberate exclusion of minority religions is permissible so long as

the selection process does not align the government with a *single* sect or creed.
Taken to its logical extension, defendants' argument implies that a guest chaplain
policy explicitly permitting, for example, only Christian and Jewish presenters
would not offend the Constitution because the government is not affiliating itself
with a "single" religious perspective. We believe the Establishment Clause
prohibits such intentional discrimination.

The Framers adopted the Establishment Clause to protect against
government's establishment of one religious viewpoint to the exclusion of others.
See Town of Greece, 134 S. Ct. at 1822; Marsh, 463 U.S. at 793, 794-95; Larson
v. Valente, 456 U.S. 228, 244 (1982); Engel v. Vitale, 370 U.S. 421, 429 (1962). More
than 50 years ago, the Supreme Court explained that, at time of adoption of the
Constitution, "one of the greatest dangers to the freedom of the individual to
worship in his own way lay in the Government's placing its official stamp of
approval upon one particular kind of prayer or one particular form of religious
services." Engel, 370 U.S. at 429. We are hard pressed to believe that establishment
of "two" religious viewpoints would sit well with the Founding Fathers or allay their
concerns about state-sponsored religion, even in the nonpareil legislative prayer
context. As Justice Blackmun commented in County of Allegheny, the
"simultaneous endorsement of Judaism and Christianity is no less constitutionally
infirm than the endorsement of Christianity alone." County of Allegheny, 492 U.S.
at 615. Relevant to the instant prayer practice, we find it equally unimaginable that
the Framers would sanction the government placing its imprimatur on one *category*

of preferred religious beliefs in the legislative prayer realm.  See Town of Greece, 134 S. Ct. at 1844 & n.1 (Kagan, J., dissenting).

This determination finds footing in the origins of legislative prayer and the selection of chaplains in the First Congress.  Professor Finkelman notes that when Congress first created chaplaincies in 1789, it passed a resolution that attempted to reflect religious diversity.  (Expert Rpt. at 21).  The resolution required the House and Senate chaplains to represent different denominations and to rotate between the two chambers every week.  (Id.)  The policy only ensured diversity between Protestant denominations, but during the Founding era nearly everyone in the country was a Protestant Christian.  (Id. at 22).  Moreover, as explained in Justice Stevens' historical analysis in dissent in Van Orden v. Perry, 545 U.S. 677 (2005), "many of the Framers understood the word 'religion' in the Establishment Clause to encompass only the various sects of Christianity."  Id. at 726-29 (Stevens, J., dissenting).

Thus, in the Founding era, the primary evil that Framers sought to prevent through the Establishment Clause may well have been the establishment of a state religion aligning with one particular sect of Protestant Christianity.  Id.; (Expert Rpt. at 22).  Over centuries that understanding has evolved and, quite naturally, broadened.  As evinced by modern legislative prayer cases and other Establishment Clause jurisprudence, constitutional challenges to prayer practices typically allege an impermissible government preference for Christianity in general, rather than one particular Christian denomination.  See, e.g., Town of Greece, 134 S. Ct. at 1817-18; Bormuth v. County of Jackson, 870 F.3d 494, 509 (6th Cir. 2017) (*en banc*)

*cert.* denied, 138 S. Ct. 2708 (2018) (mem.); Lund, 863 F.3d at 281, 283; Rubin v. City

of Lancaster, 710 F.3d 1087, 1097 (9th Cir. 2013); Hudson v. Pittsylvania County, 107

F. Supp. 3d 524, 534 n.8, 536, 538 (W.D. Va. 2015).  None of these decisions suggests

that if different Christian sects were represented, a legislative prayer practice solely

advancing Christianity would pass constitutional muster.  In light of this nation's

vastly diverse religious tapestry, there is no justification to sanction government's

establishment of a category of favored religions—like monotheistic or theistic

faiths—through legislative prayer.

### iii.    Post-<u>Town of Greece</u> Decisions

Recently, the district court for the Middle District of Florida found a practice

strikingly similar to the Pennsylvania House of Representatives' policy to be

unconstitutional.  In Williamson v. Brevard County, 276 F. Supp. 3d 1260 (M.D. Fla.

2017), atheist and Secular Humanist plaintiffs challenged a county policy permitting

only theistic presenters to deliver the opening prayer at county board meetings.

Plaintiffs had requested the opportunity to deliver the invocation and were denied.

Williams, 276 F. Supp. 3d at 1266-67.  In response to the nontheists' requests, the

county adopted a resolution that required presenters delivering the pre-meeting

prayer to be from the "faith-based community."  Id. at 1269-71.  The court explained

that, while the resolution did not define "faith-based community," the meaning of

the phrase and the "actual, overall invocation practice" could be gleaned from the

resolution's text, evidence of events in the case, and statements made by county

commissioners.  Id. at 1278.  The actual policy, the court found, was a "categorical

ban on . . . nontheists as givers of opening invocations" at county board meetings. Id. at 1281.

The court determined, after reviewing Marsh and Town of Greece, that the county's intentionally discriminatory policy violated the Establishment Clause. Id. at 1272-76, 1289. The court rejected the county's arguments that its selection policy was sufficiently inclusive and comported with Town of Greece. Id. at 1281. Like defendants here, the county argued that opening prayers necessarily must invoke a higher power and, because nontheists do not believe in a higher power, they are not qualified to deliver the invocation. Id. The court repudiated this "overly narrow" view of an opening invocation, explaining that nontheistic invocations, like their theistic counterparts, can serve the solemnizing and unifying purposes of legislative prayer. Id. at 1281-82. The court concluded that "[b]y straying from the historical purpose of an invocation and intentionally discriminating against potential invocation-givers based on their beliefs," the county violated the Establishment Clause. Id. at 1289.[8]

At first blush, Barker v. Conroy, 282 F. Supp. 3d 346 (D.D.C. 2017), appeal filed, No. 17-5278 (D.C. Cir. Dec. 20, 2017), appears to provide some support for defendants' position. Plaintiff Daniel Barker—an atheist previously ordained as a Christian minister—disputed the United States House of Representatives' denial of his request to deliver the opening invocation. Barker, 282 F. Supp. 3d at 351. The

---

[8] The Williamson court also found the county's policy violated the Establishment Clause because the county "entangle[ed] itself in religion by vetting the beliefs of those groups with whom it is unfamiliar" before determining whether to allow a member of the group to give the invocation. Id.

House's policy, promulgated by its chaplain, required guest chaplains to be sponsored by a House member, be ordained, and deliver an invocation that addresses a "higher power." Id. The House chaplain denied Barker's request because he was "ordained in a denomination in which he no longer practice[d]" and was "not a religious clergyman [because he had] parted with his religious beliefs." Id. (citation omitted) (second alteration in original). Barker filed suit, raising, *inter alia*, an Establishment Clause claim oppugning the House's policy of facially excluding atheists and nonreligious guest chaplains. Id. at 351-52, 363. In rather cursory fashion, the district court dismissed Barker's claim. Id. at 363-64.

We find the court's abbreviated analysis unconvincing. Contrary to the court's explanation, see id. at 364, the House did not deny Barker's request because of his desire to give a secular invocation. The House chaplain rejected Barker's request because Barker no longer practiced or represented the faith in which he was ordained. Id. at 351. More importantly, although Barker contended that he was challenging the constitutionality of intentional discrimination against atheists and nontheists rather than theistic legislative prayer itself, see id. at 363, 364, the court construed his claims as "a challenge to the ability of Congress to open with a prayer." Id. at 364. The court reasoned that to side with Barker "would be to disregard the Supreme Court precedent that permits legislative prayer." Id. This construction of Barker's claim doomed it from the start: after Marsh and Town of Greece, no serious dispute remains as to the constitutionality of legislative prayer.

Furthermore, seeking to include secular or nontheist invocations does not automatically impugn the constitutionality of legislative prayer. As plaintiffs in the

instant case exhaustively demonstrate, many legislative bodies have granted requests from atheists, Secular Humanists, and other nontheists to deliver opening invocations while simultaneously permitting theistic invocations. (See Doc. 91 at 48; Expert Rpt. at 10, 25; Doc. 77-10 at 15-43). Granting such requests has not resulted in a concomitant challenge to the ability of the legislative body to open with prayer. The two concepts are not mutually exclusive. To hold otherwise implies that "prayer" in the legislative prayer context *must* be defined as a theistic invocation, which of course is not so.[9]

### b. Nontheists Cannot Satisfy House Requirements or Legislative Prayer Purposes

Defendants next argue that because the House has defined "prayer" in House Rule 17 to mean an appeal to a higher or divine power, the nontheist plaintiffs are incapable of providing an opening invocation meeting this definition. Defendants further contend that plaintiffs cannot fulfill the purposes of legislative prayer, to wit: to "accommodate the spiritual needs" of the legislators and to solicit "divine guidance for the benefit of the legislators." (Doc. 82 at 28, 29, 39-41).

We reject defendants' narrow view of legislative prayer and its objectives. First, while the Speaker of the House may interpret "prayer" and House Rule 17 to

---

[9] Defendants also cite Simpson v. Chesterfield County Board of Supervisors, 404 F.3d 276 (4th Cir. 2005), Atheists of Florida v. City of Lakeland, 713 F.3d 577 (11th Cir. 2013), and then-Judge Ginsburg's dissent in Kurtz v. Baker, 829 F.2d 1133, 1145-52 (D.C. Cir. 1987). We find these cases equally unhelpful to defendants' cause, primarily because they predate Town of Greece. Atheists of Florida is also inapplicable because the court of appeals never actually reached the issue of intentional discrimination against nontheists in guest chaplain selection. Atheists of Florida, 713 F.3d at 592-95.

require an appeal to a higher or divine power, that definition does not dictate the constitutionality of the House's prayer practice.  The Speaker could, presumably, define "prayer" in an exclusively Christian manner and apply that definition to categorically exclude every non-Christian from delivering opening prayers in the House.  Such exclusion through definition would unquestionably run afoul of the Establishment Clause.

Second, defendants' perception of the purposes of legislative prayer is myopic.  In Town of Greece, the Court explained that legislative prayer "lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." Town of Greece, 134 S. Ct. at 1818 (citing Lynch v. Donnelly, 465 U.S. 668, 693 (1984) (O'Connor, J., concurring)).  It is meant to "reflect values long part of the Nation's heritage" and to be "solemn and respectful in tone," inviting our legislators "to reflect upon shared ideals and common ends before they embark on the fractious business of governing[.]" Id. at 1823.  As Justice O'Connor observed in an earlier case, legislative prayer serves "the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." Lynch, 465 U.S. at 693 (O'Connor, J., concurring).

Nontheistic invocations are equally capable of satisfying these lofty objectives.  We reiterate that many legislative bodies across this nation have opened with nontheistic invocations, and there is no evidence that such prayers fared worse than their theistic counterparts at fulfilling the foregoing purposes.  We further

observe that *both* theistic and nontheistic invocations could contravene the purposes of legislative prayer if they were divisive, exclusionary, or disparaging. In other words, it is the content of the prayers, rather than their theistic or nontheistic nature, that matters.

Finally, we find no merit in defendants' insistence that plaintiffs could not deliver invocations that accommodate the spiritual needs of the lawmakers. (See Doc. 82 at 28, 29, 39-41). At least one House member openly identifies as a secular agnostic. (Doc. 90 ¶ 62). He testified that he occasionally would like to hear secular opening invocations. (Id.) Another member testified that he would be "more than happy" to sponsor an atheist's request to give an opening invocation. (Id. ¶ 63). Further exploration of the scope of lawmakers' spiritual needs is unnecessary, as we do not understand defendants to argue that the spiritual needs of the minority are less important than those of the majority.

### c. Prohibiting Discrimination Based on Religion Would Remove Ability to Regulate Invocations

Defendants warn that if the House policy is found to be unconstitutionally discriminatory, the House will be obligated to invite as guest chaplain any person who "practices religion," resulting in "no permissible means of excluding faiths and belief systems that might be abhorrent or antithetical to its Members or legislative mission." (Doc. 82 at 48). Defendants reference fringe religious groups that align with white supremacy, mockery of religion, and subjugation of women, as well as extremist sects like Westboro Baptist Church, known for its virulent anti-LGBTQ

beliefs and rhetoric, <u>see</u> <u>Snyder v. Phelps</u>, 562 U.S. 443, 448 (2011).  We find defendants' floodgate concerns misplaced.

Defendants insist that "if the House is constitutionally prohibited from excluding 'minority faiths,' it is also constitutionally required to invite any number of groups who embrace hateful (or otherwise unwelcome) religious beliefs." (Doc. 100 at 26 (emphasis omitted)).  This is plainly incorrect.  <u>Town of Greece</u> specifically found that legislatures do not have to attempt to "achieve religious balancing" by seeking out and inviting diverse religious viewpoints.  <u>Town of Greece</u>, 134 S. Ct. at 1824.  Moreover, ending a practice of intentional discrimination against minority faiths does not remove all discretion in guest chaplain selection.  Defendants' doomsday predictions imply that the House's current selection policy is the only method to ensure traditional and solemn guest-led invocations that serve the purposes of legislative prayer.  But of course this is not the case.

As plaintiffs observe, there would be no constitutional infirmity with a policy barring invocations that promote white supremacy, disparage other religious views, encourage subjugation of women, or exhibit animus toward the LGBTQ community.  Such loathsome and abhorrent objectives obviously have no place in legislative prayer.

We conclude that the House guest chaplain policy facially violates the Establishment Clause of the First Amendment to the United States Constitution. The House policy intentionally discriminates among invocation presenters on the basis of religion and thereby transcends the bounds of permissible legislative prayer.  Accordingly, we will grant plaintiffs' motion for summary judgment on

their Establishment Clause challenge to the guest chaplain policy and deny defendants' related motion for summary judgment.

## B. Establishment Clause Challenge to House Invocation Practices

Plaintiffs also contend that the House's pre-2017 and current invocation practices directing visitors to rise for the opening prayer unconstitutionally coerce participation in a religious exercise.  They maintain that the Speaker's instruction to stand and the related sign outside the visitors' gallery coerce visitors to take part in prayer, thus violating the Establishment Clause.  Plaintiffs further argue that the pre-2017 practice—which included legislative security officers instructing seated visitors to comply with the Speaker's directive—is likewise constitutionally infirm and is not moot because it easily could be reinstated.

As we explained in our prior opinion, Town of Greece had no majority consensus on the subject of Establishment Clause coercion in the legislative prayer context.  Fields, 251 F. Supp. 3d at 789-90.  We found that Justice Kennedy's three-Justice plurality opinion represents the narrowest grounds to the Court's judgment and provides the prevailing standard against which to judge plaintiffs' coercion claims.  Id. at 790.  That opinion tasks us to review the contested practice to assess whether it is consonant with the tradition upheld in Marsh or whether coercion is indeed likely.  Town of Greece, 134 S. Ct. at 1826-27 (plurality opinion).  We must consider "both the setting in which the prayer arises and the audience to whom it is directed."  Id. at 1825.  Under the plurality's test, coercion is a real and substantial likelihood when the government itself (1) directs public participation in prayers,

(2) critiques dissenters, or (3) retaliates in its decisionmaking against those who choose not to participate. <u>Id.</u> at 1826. All Justices agreed that this analysis is "fact-sensitive." <u>Id.</u> at 1825; <u>id.</u> at 1838 (Breyer, J., dissenting); <u>id.</u> at 1851-52 (Kagan, J., dissenting); <u>see</u> <u>also</u> <u>id.</u> at 1828-29 (Alito, J., concurring).

The current House invocation practice is not unconstitutionally coercive. Unlike an intimate local government meeting, the prayer practice here involves legislative sessions of the Pennsylvania House of Representatives. The House has 203 members and convenes in the state capitol building's largest chamber, which contains an elevated and removed visitors' gallery that holds 80 to 90 people. Visitor attendance is voluntary and unrelated to actual lawmaking. The invocation is directed primarily to the House members, as opposed to many municipal settings where the invocation is delivered predominantly to the citizen-visitors in attendance, <u>see</u>, <u>e.g.</u>, <u>Town of Greece</u>, 134 S. Ct. at 1846-48 (Kagan, J., dissenting); <u>Lund</u>, 863 F.3d at 286-87; <u>Hudson</u>, 107 F. Supp. 3d at 536-37. Finally, the invocation is followed directly by the Pledge of Allegiance, during which House members and visitors are also invited to stand.

These circumstances do not permit the conclusion that the Speaker's directive and the sign asking House members and visitors to "please rise as able" amount to unconstitutional coercion that would violate the Establishment Clause. <u>See</u> <u>Williamson</u>, 276 F. Supp. 3d at 1291-92. Plaintiffs are free to remain seated during the invocation and need not participate in the prayer practice. Under the current policy, there does not appear to be any retaliation against visitors who choose not to rise, nor any type of censure or singling out of "dissidents."

The pre-2017 invocation practice is a different matter.[10]  Requiring visitors to stand and having Sergeants at Arms repeatedly and loudly direct consciously seated visitors to comply with the Speaker's request to stand amounts to an unconstitutional level of coercion.  Such a scenario is precisely the "singl[ing] out [of] dissidents for opprobrium" that the plurality cautioned would offend the Establishment Clause.  Town of Greece, 134 S. Ct. at 1826.  Coercion under those circumstances "is a real and substantial likelihood."  Id. at 1827.  We hold that the pre-2017 House invocation practice is unconstitutionally coercive and contravenes the Establishment Clause.  We will therefore grant plaintiffs' motion for summary judgment as to the pre-2017 House practice but grant defendants' motion as to the current practice.

### C.      Permanent Injunctive Relief

Our inquiry does not end with a determination that plaintiffs have prevailed on the merits of some of their Establishment Clause claims.  Before the court may grant permanent injunctive relief, plaintiffs must prove: *first*, that they will suffer irreparable injury absent the requested injunction; *second*, that legal remedies are inadequate to compensate that injury; *third*, that balancing of the respective

---

[10] Simply because the pre-2017 practice has been voluntarily abandoned due to litigation does not remove it from the purview of the court.  "[V]oluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000) (citation omitted).  The issue would be moot only "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  Id. (citation omitted).  We find no such absolute clarity that the pre-2017 practice could not be re-implemented. Plaintiffs' challenge to this policy is not moot.  Cf. Pelphrey v. Cobb County, 448 F. Supp. 2d 1357, 1374 (N.D. Ga. 2006).

hardships between the parties warrants a remedy in equity; and *fourth*, that the public interest is not disserved by an injunction's issuance.  See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (citations omitted).

The injury here is irreparable, as "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." K.A. *ex rel.* Ayers v. Pocono Mountain Sch. Dist., 710 F.3d 99, 113 (3d Cir. 2013) (alteration in original) (quoting Elrod v. Burns, 427 U.S. 347, 373-74 (1976) (plurality opinion)).  We have previously explained that injunctive relief is "especially appropriate" when First Amendment rights are violated, because money damages are usually inadequate relief.  Jamal v. Kane, 105 F. Supp. 3d 448, 462-63 (M.D. Pa. 2015) (Conner, C.J.) (quoting Stilp v. Contino, 743 F. Supp. 2d 460, 470 (M.D. Pa. 2010) (Conner, J.)).  Furthermore, sovereign immunity would bar money damages claims against defendants in their official capacities.  Edelman v. Jordan, 415 U.S. 651, 663 (1974).  Because there is no adequate legal remedy to compensate plaintiffs' constitutional injuries, declaratory and injunctive relief will ensure that plaintiffs do not continue to suffer irreparable harm.

As to the respective hardships between the parties, we fail to ascertain any real hardship defendants would suffer from an award of permanent injunctive relief.  Defendants have identified none, save for its arguments regarding the purported loss of ability to screen objectionable guest chaplains, which we have squarely addressed.  Plaintiffs, *per contra*, would continue to suffer the First Amendment injuries described in this opinion if a permanent injunction were not granted.  The balancing of hardships thus militates in favor of plaintiffs' requested

injunction. Finally, we find the public interest is advanced, rather than disserved, by permanently enjoining a House policy and practice that violate the Constitution. Cf. Jamal, 105 F. Supp. 3d at 463. We will grant plaintiffs' request for permanent injunctive relief.

## IV. **Conclusion**

The Pennsylvania House of Representatives' current guest chaplain policy facially violates the Establishment Clause of the First Amendment to the United States Constitution. The policy purposefully discriminates among invocation presenters on the basis of religion and thus exceeds the constitutional boundaries of legislative prayer. The House's pre-2017 opening invocation practice, which coerces visitors to stand during the opening prayer and thereby participate in a religious exercise, likewise offends the Establishment Clause. We will grant partial summary judgment, declaratory judgment, and permanent injunctive relief to plaintiffs. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    August 29, 2018